SAMUEL H. KESSNER AND TESSIE D. KESSNER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JOSEPH RABINOWITZ AND MARY RABINOWITZ, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 53108, 53109. Filed September 17, 1956.

*Abraham Tannenbaum, Esq.*, and *Joseph L. Jonick, Esq.*, for the petitioners.

*William F. Fallon, Esq.*, for the respondent.

1048

## OPINION.

FISHER, *Judge:* Upon the circumstances involved herein, as they appear after a careful consideration of the entire record, we hold the distributions received by petitioners in redemption of their preferred stock to be in whole essentially equivalent to the distribution of a taxable dividend [1] within the purview of section 115 (g) (1) [2] of the

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" * * * means any distribution made by a corporation to its shareholders whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of earnings and profits at the time the distribution was made. * * *

[2] (g) REDEMPTION OF STOCK.—

(1) IN GENERAL.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

Internal Revenue Code of 1939 and the applicable Treasury regulations.[3]

Congress has broadly defined the term "dividend" to include *"any distribution* made by a corporation to its shareholders" out of earnings and profits. (Emphasis added.) Sec. 115 (a), 1939 Code. Moreover, as far back as 1926 [4] Congress plugged the loophole whereby, in the disguise of a nontaxable cancellation, redemption, or partial liquidation of stock,[5] "a corporation, especially one which has only a few stockholders, might without resorting to the device of a stock dividend, be able to make a distribution to its stockholders which would have the same effect as a taxable dividend." H. Rept. No. 1, 69th Cong., 1st Sess. (1925), p. 5, 1939–1 C. B. (Part 2) 315, 318; S. Rept. No. 52, 69th Cong., 1st Sess. (1926), p. 15, 1939–1 C. B. (Part 2) 332, 344; H. Rept. No. 356, 69th Cong., 1st Sess. (1926), p. 30, 1939–1 C. B. (Part 2) 361–362. See also H. Rept. No. 179, 68th Cong., 1st Sess. (1924), p. 12, 1939–1 C. B. (Part 2) 241, 250; S. Rept. No. 398, 68th Cong., 1st Sess. (1924), p. 13, 1939–1 C. B. (Part 2) 266, 275.

Thus, our principal concern is whether the net effect of the transactions involved, absent a real and substantial business reason on the part of the corporation as distinguished from a purpose to benefit the shareholders, was to distribute accumulated earnings and profits among the shareholders the same as if a cash dividend had been declared and paid. *James F. Boyle*, 14 T. C. 1382, affd. (C. A. 3, 1951) 187 F. 2d 557; certiorari denied 342 U. S. 817; *Smith* v. *United States*, (C. A. 3, 1941) 121 F. 2d 692; *Brown* v. *Commissioner*, (C. A. 3, 1935) 79 F. 2d 73; *Flanagan* v. *Helvering*, (C. A. D. C., 1940) 116 F. 2d 937. Hence, while it may be asserted that the intention of shareholders was to withdraw invested capital no longer deemed necessary to the needs of the business, the circumstances of the time and manner in which distributions in redemption of stock are made

---

[3] Regulations 111:

SEC. 29.115–9. DISTRIBUTION IN REDEMPTION OR CANCELLATION OF STOCK TAXABLE AS DIVIDEND.—(a) *In general.*— * * *

The question whethter a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913. * * *

[4] Revenue Act of 1926, sec. 201 (g), 44 Stat. 9, 11, which is the forerunner of sec. 115 (g), 1939 Code.

[5] Subsection (c) of section 115, upon which the principles of subsection (g) have been superimposed, provides that "amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock," thus according any gain realized the benefit of capital gains treatment. A partial liquidation is defined in subsection (i) as a "distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock."

may, nevertheless, bring them within the purview of section 115 (g). *George Hyman*, 28 B. T. A. 1231, affd. (C. A. D. C., 1934) 71 F. 2d 342, certiorari denied 293 U. S. 570; *Arthur M. Godwin*, 34 B. T. A. 485; *Estate of Charles D. Chandler*, 22 T. C. 1158, affd. (C. A. 6, 1955) 228 F. 2d 909. In this regard, a cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders—consistent with the above long-standing announced congressional purpose—will generally be considered as effecting a distribution essentially equivalent to a dividend to the extent of post-February 28, 1913, earnings and profits. Regs. 111, sec. 29.115-9. Moreover, no particular lapse of time between any of the steps of a disguised distribution of a taxable dividend would necessarily estop it from coming within the ambit of section 115 (g) so long as we are convinced from all the circumstances that stock redemptions were made "at such time and in such manner" as to make them essentially equivalent to a taxable dividend. *Shelby H. Curlee*, 28 B. T. A. 773, affirmed sub nom. *Randolph v. Commissioner*, (C. A. 8, 1935) 76 F. 2d 472, certiorari denied 296 U. S. 599; *Leopold Adler*, 30 B. T. A. 897. Similarly, a history of cash dividend declarations, or the amounts thereof, is but one part of the entire factual complex to be given more or less weight in light of all the circumstances involved. See *Annie Watts Hill*, 27 B. T. A. 73, affd. (C. A. 4, 1933) 66 F. 2d 45.

The decision in each case will depend upon its own particular circumstance. Regs. 111, sec. 29.115-9. For these purposes, absence of bad faith is a fact to be considered, but is not of itself controlling. *Estate of Charles D. Chandler, supra.* No fixed plan need have pre-existed or predicated the questioned distributions. *Annie Watts Hill, supra; Charles A. McGuire*, 32 B. T. A. 1075, affd. (C. A. 7, 1936) 84 F. 2d 431, certiorari denied 299 U. S. 591; cf. *Pearl B. Brown*, 26 B. T. A. 901, 908-909, affd. (C. A. 7, 1934) 69 F. 2d 602, certiorari denied 293 U. S. 579. Nor does it matter that the redeemed shares were originally issued for value rather than as a stock dividend. Sec. 115 (g), *supra.* The burden is, of course, upon the petitioner to prove that the respondent's determination was erroneous. *Charles A. McGuire, supra; Shelby H. Curlee, supra.*

Petitioners have not proved that the respondent erroneously stripped away the tax shelter of the stock redemption form of distributing post-February 28, 1913, earnings and profits.[6] Petitioners' contention that the redemptions were "analagous to the recovery of capital loans contributed to the corporation although not needed in the business" is contrary to the evidence. In the first place, we find that at the time the corporation began its active functions, the preferred stock represented part of a capital investment suitable to the prospective

---

[6] It is clear that all of the distributions were out of post-February 28, 1913, earnings and profits.

needs of the corporation, and, when issued, was accepted and considered as an investment and not as a loan of any sort. At the time the decision was made to incorporate, net invested capital of the partnership, after 3 years of continuously expanding operations, had reached and exceeded the $200,000 mark. There was every prospect of continued success and expansion. The loan officer at the bank which extended credit to the partnership testified as petitioners' witness that in his opinion, when consulted in the latter part of 1945, the business did need the $200,000 capital on March 1, 1946. There is no hint in the offering letter from the partnership, the minutes of the special meeting of the officers of the new corporation accepting the offer, or the indenture formally transferring the business from the partnership to the corporation, that the preferred stock was intended to constitute a loan or that it was felt that the capitalization was excessive in that amount. The manner in which the transaction was recorded on the corporate books is consistent with its treatment in the foregoing documents. The preferred stock had none of the incidents which, while masking the label of preferred stock, might equate it to security for a loan. For example, the dividend rights were noncumulative and its holders had absolutely no voting rights—even in the event of a sale of the corporate franchise and all its assets. There was no fixed time for retirement or cancellation of any part or all of the shares.

We also reject petitioners' contention that the $70,000 of United States savings bonds, together with about $16,000 of life insurance cash surrender values, were "outside investments" not properly includible in a computation of the partnership's or the new corporation's required net operating capital in and around March 1, 1946. The business depended upon bank loans and extensions of credit from suppliers to tide it over the regular April or May to September or October peak inventory period. Credit was geared to working capital—viz, the excess of current assets over current liabilities or, otherwise stated, that fund which is readily available for the continued day-to-day operation of the business. A practical test of a business' current position would probably even exclude merchandise inventory from the calculation, as it normally becomes liquid only upon sale and realization of the resulting accounts receivable. Finney, Principles of Accounting–Intermediate, ch. 27, pp. 527–528 (3d ed., 1949). For a truly conservative estimate of working capital, therefore, only about $47,000 of cash in banks, in addition to accounts receivable of $157,000 would have been available without taking into account the United States bonds and life insurance cash surrender values—to be considered against $213,000 of accounts payable and $50,000 of notes payable. We have found, upon the entire record, that the United States bonds and the life insurance cash surrender values were re-

garded and used the same as cash. Actually, before the United States bonds were gradually consumed in the ever-increasing need for working capital as the business grew and eventually accumulated a sizable amount of cash in banks even in excess of its needs, such bonds represented the significant portion of the "Monthly Bank Balances and U. S. Bonds" excess over "Monthly Indebtedness to Banks" schedules. Also, the majority stockholder and former senior partner testified as respondent's witness that it "wasn't necessary to have *any more money*" than the "$75,000 in Government Bonds" plus the "balances in the bank of $40,000 and $50,000 and sometimes $70,000." As events later proved, a capitalization of at least $350,000 was required for the corporation's continually expanding operation as monthly indebtedness to banks alone exceeded $200,000 during the 1951 peak inventory period (reaching $300,000 in July).

Secondly, by all of the tests the present transactions are governed by section 115 (g). *Flanagan* v. *Helvering, supra; Brown* v. *Commissioner, supra; James F. Boyle, supra; Smith* v. *United States, supra; Hyman* v. *Helvering*, 71 F. 2d 342; *Estate of Charles D. Chandler, supra*. There was no retrenchment of corporate activities. There was no contraction of corporate invested capital. In fact, both increased. There was no alteration or diminution in petitioners' proportionate interest in the corporation. By February 28, 1950, the close of the fiscal year preceding the first pro rata preferred stock redemption, the balance of earned surplus amounted to more than $129,000 after a $100,000 common stock dividend which replaced the preferred in the capital structure. When the redemption was voted on April 1, 1950, cash in banks had accumulated in excess of $260,000 with no outstanding indebtedness to banks. When the second redemption was voted on December 1, 1951, cash in banks had accumulated in excess of $190,000 with no outstanding liability to banks, and the balance of earned surplus then approximated $276,000. The only practical effect of the redemptions was to make cash distributions of corporate earnings and profits pro rata among the shareholders the same as if a dividend in cash had been declared and paid.

The fact that the director-officer-shareholders had already received nearly $80,000 of cash dividends during the period under review supports rather than detracts from our conclusion. For that matter, they had also received salaries in the aggregate of nearly $260,000 over the period. Both were fully taxable sources of income to them (sec. 22 (a), 1939 Code) and only the salary payments, which had already been increased from $31,000 to $57,000, were deductible by the corporation (secs. 13, 15, 23 (a) (1)). Corporate earnings for the period approached $750,000 (over $432,000 after taxes). Nearly $250,000 was still left in earned surplus on February 28, 1952, after all of these transactions. The present record does not warrant a finding

that the redemptions were not motivated by and for the sole benefit of the shareholders as a means of reducing their taxes. That the corporation's obligation to pay 5 per cent dividends ceased is not a sufficiently material and substantial corporate business purpose to offset all the other significant indicia of a taxable dividend. *James F. Boyle, supra; Estate of Charles D. Chandler, supra; Samuel D. Towers,* 24 T. C. 199, 224, 230. There is no showing that payment of the 5 per cent dividends was a significant drain on the corporation's resources or that it unduly affected the corporation's credit. Cf. *Bona Allen, Jr.,* 41 B. T. A. 206; *Joseph W. Imler,* 11 T. C. 836.

Petitioners' contentions with respect to hidden goodwill among the partnership assets transferred to the corporation are not material or relevant for these purposes as there is no showing that the goodwill was capitalized or that the redemptions had any relation thereto or constituted any contraction thereof. Cf. *Pearl B. Brown, supra.*

We readily distinguish our earlier decisions relied upon by petitioners.[7] In those cases we found that a real and substantial corporate purpose was actually accomplished by the stock redemptions. Their facts are entirely unlike those found here. In no event would they control our decision here which is based upon the particular circumstances involved.

*Decisions will be entered for the respondent.*

---

[7] *J. Paul McDaniel,* 25 T. C. 276; *John L. Sullivan,* 17 T. C. 1420, affd. (C. A. 5, 1954) 210 F. 2d 607; *G. E. Nicholson,* 17 T. C. 1399, appeal dismissed (C. A. 10, 1953) 204 F. 2d 690; *Joseph W. Imler,* 11 T. C. 836; *Fred B. Snite,* 10 T. C. 523, affd. (C. A. 7, 1949)' 177 F. 2d 819; *Bona Allen, Jr.,* 41 B. T. A. 206; *George A. Lembcke,* 33 B. T. A. 700.'

*Atlantic National Bank of Jacksonville* v. *Fahs,* (D. Fla., 1955) 48 A. F. T. R. 1853, 55 U. S. T. C. Par. 9618 is similarly distinguishable, as are *Keefe* v. *Cote,* (C. A. 1, 1954) 213 F. 2d 651, and *Jones* v. *Griffin,* (C. A. 10, 1954) 216 F. 2d 885.