E. H. STOLZ, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ZOE STOLZ, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 55990, 68085. Filed June 6, 1958.

*William Andress, Jr., Esq.*, for the petitioners.

*David E. Mills, Esq.*, and *M. Clifton Maxwell, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax against the petitioners for the taxable year 1950, with respect to E. H. Stolz in the amount of $1,955.15, and with respect to Zoe Stolz in the amount of $2,042.63.

The sole issue is whether the redemption of preferred stock was essentially equivalent to the distribution of a taxable dividend.

## FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

The petitioners are husband and wife residing in Grand Prairie, Texas. Each filed a separate individual income tax return for the calendar year 1950 with the collector of internal revenue for the second district of Texas at Dallas. Zoe Stolz is involved as a petitioner herein solely because of having reported separately her share of community property income. The petitioner E. H. Stolz will hereinafter be referred to as the petitioner.

The petitioner was employed by Ford Motor Company from 1915 to 1949, except for two periods, from 1936 to 1938 and from 1942 to 1946. He became a branch manager and later a chief inspector. From 1942 to 1946, he was employed at the North American Aviation Company's wartime plant at Grand Prairie, Texas.

While working for North American, the petitioner became acquainted with another employee, Alvin V. Graff. The petitioner had become familiar with the town of Grand Prairie and he and Graff considered the possibility of obtaining a franchise for a Ford automobile dealership in Grand Prairie. Inasmuch as the petitioner had substantial automobile experience with the Ford Motor Company organization, but did not have the necessary capital to finance a dealership venture, and inasmuch as Graff was able to provide necessary funds, they entered into a written agreement on August 28, 1947, which contemplated the procurement of a Ford franchise. It was agreed, among other things, that if the petitioner could obtain for a corporation to be organized a franchise from Ford Motor Company, Graff would provide the necessary financing.

The agreement contemplated a corporation to be organized with capital stock of 30,000 shares of 5 per cent cumulative redeemable preferred stock, and 1,000 shares of common stock, all the stock to have a par value of $1 per share, and all to be voting stock. Graff was to invest $30,500 for all the 30,000 shares of preferred stock and 500 shares of common stock. The petitioner was to invest $500 for 500 shares of common stock. The parties further agreed that the articles of incorporation should provide that no dividends were to be paid on the common stock until all the preferred stock had been redeemed, purchased, or retired by the corporation. In the negotiations leading up to the agreement it was understood between the petitioner and Graff that Graff was to recover his capital out of the earnings of the business before any dividends were to be paid on the common stock. Salaries, however, were to be paid to the petitioner and to Graff.

On September 18, 1947, the petitioner and Graff filed a Prospective Dealer Application with Ford Motor Company for a franchise for

a Ford automobile dealership in Grand Prairie. The petitioner understood that Ford Motor Company would require a capitalization of $20,000, $30,000, or $40,000, and that the petitioner would own at least a half interest in the business. The application for the franchise set forth an intention of the petitioner and Graff to organize a corporation in which each would make an investment of $15,000. Financial statements were also submitted setting forth the assets and liabilities of each individual. The petitioner showed a gross and net worth of approximately $12,000. Graff showed a net worth of approximately $145,000. On May 26, 1949, a Ford franchise was granted.

On July 26, 1949, Stolz-Graff Motors, Inc., was incorporated in Texas. Capital stock of the corporation was authorized and issued amounting to 19,000 shares of preferred stock and 1,000 shares of common stock, all stock having a par value of $1 per share with each share entitled to one vote. The preferred stock was 5 per cent cumulative and redeemable at par plus dividends in arrears. Graff subscribed and paid for 19,500 shares of stock, receiving 500 shares of common and all 19,000 shares of preferred. The petitioner subscribed and paid for 500 shares of common stock (except for one qualifying share which was issued to the petitioner's attorney).

Bylaws adopted by the corporation included a provision that no dividends were to be declared on the common stock so long as any preferred stock was unredeemed.

On August 5, 1949, the corporation borrowed $20,000 from Graff for which a promissory note was issued payable on or before 1 year from the date of the note with interest at 5 per cent per annum.

At a directors' meeting of the corporation on October 3, 1949, the agreement of August 28, 1947, between the petitioner and Graff, above-referred to, was ratified and adopted by the corporation as to all provisions relating to the corporation.

The corporate charter was amended on December 19, 1949, increasing the authorized capital stock by 10,000 shares of preferred stock and increasing the preferred dividend rate from 5 per cent to 6 per cent. The preferred stock was increased because Ford Motor Company stated that the corporation was undercapitalized. The additional preferred stock was issued to Graff and paid for by a $10,000 reduction of the corporation's $20,000 note of August 5 payable to Graff.

After the increase in the capitalization of the corporation the Ford Motor Company insisted that the petitioner have a half interest in the business. It had been understood by the petitioner and Graff from the time of the initial application for the franchise that Ford's requirement was that the petitioner own a half interest. In January 1950, the petitioner and Graff entered into an agreement, effective as of December 22, 1949, whereby Graff sold, transferred, and assigned to the petitioner 14,500 shares of preferred stock, being half of all the

outstanding preferred stock. The petitioner gave his promissory note to Graff for $14,500, with interest at 6 per cent. The note had no fixed maturity date and was payable both as to principal and interest out of, and only out of (except as the petitioner might otherwise voluntarily pay), cash dividends and other distributions on the stock to be pledged to Graff as security, and cash proceeds from the redemption and/or purchase of any of such stock by the corporation. The petitioner agreed to pay over to Graff immediately upon receipt thereof any cash dividends or other distributions. It was provided in the contract that the indebtedness should be considered an installment obligation, with each installment being due and payable in the amounts and at the times of cash dividends and other distributions. A collateral pledge agreement was entered into whereby the petitioner pledged all his stock of the corporation, together with all voting rights, dividends, proceeds, and distributions thereon, as security for the note. Such agreement provided that in the event of the instigation of any voluntary or involuntary insolvency proceedings against the petitioner, or in the event of his failure within 90 days to pay any judgment against him in excess of $5,000, the pledged securities could be sold and the petitioner would be liable for any deficiency.

At a meeting of the board of directors on May 3, 1950, it was decided to apply earnings of the corporation to payment of an additional $5,000 on the August 5, 1949, note indebtedness of the corporation to Graff and to redeem 10,000 shares of preferred stock. Such partial payment was accordingly made on the note. Ten thousand shares of preferred stock were redeemed equally from the petitioner and Graff, and a check was paid to each for $5,225 representing $5,000 of par value plus accrued dividends of $225. In accordance with the stockholders' agreement of December 22, 1949, whereby proceeds from a preferred stock redemption were to be applied on the petitioner's note held by Graff, the petitioner endorsed his check over to Graff who deposited it in his own personal account.

At meetings of the board of directors and of the stockholders of the corporation on August 1, 1950, the corporation authorized the redemption of the remainder of 19,000 shares of preferred stock. The minutes of the directors' meeting refers to the profitable operations of the business over the past year as follows:

A financial statement of the condition of the business as of July 31, 1950, was presented to the meeting, showing that the operations of the business had been conducted at an unusual and substantial profit, and that in addition to the payments heretofore made upon the outstanding note to Mr. Graff, and the redemption of $10,000.00 of preferred stock, there was now available on hand in cash over and above the operating needs of the business, the sum of approximately $20,000.00.

It was decided that this surplus cash be applied to the redemption of all of the outstanding preferred stock by payment of par value and accrued dividends. On August 3 the remaining preferred stock was redeemed from the petitioner and Graff, 9,500 shares from each. Each received a check for $10,070, representing $9,500 of par value plus accrued dividends of $570. As with the previous check the petitioner received on the initial redemption of his 5,000 shares, he again endorsed and delivered this $10,070 check over to Graff, who deposited it in his personal bank account. The $14,500 note of December 22, 1949, was then canceled and deemed paid in full both as to principal and interest.

Thereafter on August 9, 1950, application was made to the State of Texas to amend the corporate charter by decreasing the total capital stock to 1,000 shares of common. Approval of the charter amendment was granted on August 16.

When Ford Motor Company was advised of the redemption of all the preferred stock of Stolz-Graff Motors, Inc., leaving a $1,000 capitalization, it objected to such a small capitalization for its dealer, and insisted that its policy was not to permit any of its franchises to be operated by corporations having a capitalization of less than $30,000. In order to comply with this policy requirement, Stolz-Graff Motors, Inc., on August 23, increased its capital stock from 1,000 shares to 30,000 shares of common stock. The minutes of the directors' meeting reported that the company had available an earned surplus of $52,298.11. A stock dividend was declared of 29 shares of common stock on each share of common stock outstanding and $29,000 of earned surplus was capitalized accordingly. The additional 29,000 shares were issued equally to the petitioner and to Graff, 14,500 each, and were deemed fully paid for. An amendment to the charter was effected to reflect the increased capital stock authorized.

The redemptions of preferred stock in 1950 were not occasioned by a contraction of the business of the corporation. During that year the business of the corporation was increased.

The corporation was successful from its inception. For its fiscal year ended October 31, 1950, it had earnings of $33,787.86. The earnings and profits available for distribution at October 31, 1950, totaled $42,970.46, without taking into account the distributions in issue or the stock dividend of August 23, 1950. The corporation continued to have earnings during the fiscal year ended October 31, 1951.

In their individual income tax returns for the calendar year 1950 the petitioners, filing short form returns, each reported half of the cash dividends of $795 declared and paid by Stolz-Graff Motors, Inc.,

on the 14,500 shares of preferred stock recorded in the name of the petitioner. No other income was reported with respect to the redemptions of the preferred stock. Since the petitioners used the short form return, specific deductions were not claimed.

In each notice of deficiency, the respondent determined that the distributions of $5,000 and $9,500 made to the petitioner in redemption of preferred stock of Stolz-Graff Motors, Inc., were essentially equivalent to distributions of taxable dividends paid from earnings or profits accumulated after February 28, 1913, and taxed one-half of $14,500 to each of the petitioners.

The distributions of May and August 1950 were made at such times and in such manner that they were essentially equivalent to distributions of taxable dividends.

### OPINION.

The question presented is whether the amount of $14,500 received by the petitioner from Stolz-Graff Motors, Inc., in the year 1950 in redemption and cancellation of 14,500 shares of preferred stock constituted taxable dividends within the meaning of section 115 (g) of the Internal Revenue Code of 1939,[1] or whether such amount was received in partial liquidation of the corporation and is therefore to be treated as payment in exchange for the stock within the meaning of section 115 (c).

It is first necessary to consider the contention, first specifically raised by the petitioner in his reply brief, that the stock redeemed did not belong to him, and that in substance he was a mere conduit for the redemption of the stock on behalf of Graff. In support of this contention the petitioner points to the original agreement between himself and Graff that Graff would furnish all the money necessary to finance the Ford dealership enterprise and that Graff would be repaid his investment out of corporate earnings, prior to the payment of any dividends on the common stock. The petitioner recognizes, of course, that the preferred stock was transferred to him by Graff, after its original issuance to Graff, but would have us view such transfer as a mere formal compliance, without substance, with the requirement of Ford Motor Company that the petitioner own a one-half interest in the enterprise. We find ourselves unable to accept this view. The agreement of transfer purports to constitute a sale

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.
  (g) REDEMPTION OF STOCK.—
    (1) IN GENERAL.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

of the stock to the petitioner, and both the petitioner and Graff understood from the beginning of the enterprise that one of the requirements of Ford Motor Company was that the petitioner should own a half interest in the corporation. Furthermore, the petitioner treated the stock as his own, he and his wife reporting in their returns the dividends paid on such stock. It is urged that this transaction cannot be considered a sale since the petitioner did not incur a personal liability to pay Graff for the stock—payment to be made only out of dividends and other distributions in respect of the stock. However, we think that the fact that payment of the purchase price was to be made from this specific source does not render the transaction any less a sale. See *Estate of Raymond T. Marshall*, 20 T. C. 979.

Accordingly, we must conclude that at the time of each redemption of preferred stock, May 3, 1950, and August 3, 1950, the petitioner and Graff owned equal amounts of both the common and the preferred stock of the corporation.

Section 115 (b) of the Internal Revenue Code of 1939 provides that "every distribution is made out of earnings or profits to the extent thereof and from the most recently accumulated earnings and profits." At the time of each redemption the corporation had earnings and profits available for the payment of dividends far in excess of the amounts distributed.

A brief résumé of the historical background of section 115 (g) is helpful. In section 201 (d) of the Revenue Act of 1921, it was provided that a stock dividend shall not be subject to tax, "but if after the distribution of any such dividend the corporation proceeds to cancel or redeem its stock at such time and in such manner as to make the distribution and cancellation or redemption essentially equivalent to the distribution of a taxable dividend, the amount received in redemption or cancellation of the stock shall be treated as a taxable dividend to the extent of the earnings or profits accumulated by such corporation after February 28, 1913." Section 201 (f) of the Revenue Act of 1924 amended such provision to make it apply if there was a redemption either "before or after" the distribution of a stock dividend. Section 201 (g) of the Revenue Act of 1926 amended the provision to apply to any redemption of stock "whether or not such stock was issued as a stock dividend," which language was carried over to section 115 (g) with which we are here concerned. In connection with the enactment of section 201 (g) of the Revenue Act of 1926, the conference report accompanying that Act (H. Rept. No. 356, 69th Cong., 1st Sess., p. 30, 1939–1 C. B. (Part 2) 361) contained the following:

It has been contended that under existing law a corporation, especially one which has only a few stockholders, might without resorting to the device of a stock dividend be able to make a distribution to its stockholders which would

have the same effect as a taxable dividend. For example, assume that two men hold practically all the stock of a corporation for which each had paid $50,000 in cash, and the corporation had accumulated a surplus of $50,000 above its cash capital. It is claimed that under existing law the corporation could buy from the stockholders for cash one-half of the stock held by them and cancel it without making the stockholders subject to any tax, yet this action in all essentials would be the equivalent of a distribution through cash dividends of the earned surplus. Section 201 (g) of the House bill rewrites the provision of the existing law to make clear that such a transaction as above indicated is taxable. * * *

When section 115 (c) of the 1939 Code was amended by the Revenue Act of 1942 to provide that distributions in partial liquidation should have the benefit of the capital gain provisions, Congress again considered the applicability of section 115 (g) and stated that it "believed that section 115 (g) of the existing law is adequate protection for preventing distributions in partial liquidation from being utilized to disguise the taxation of a taxable dividend." H. Rept. No. 2333, 77th Cong., 2d Sess., p. 49, 1942–2 C. B. 373, 412.

Section 29.115–9 of Regulations 111 provides in part:

The question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913. * * *

The petitioner earnestly contends that the redemptions should not be considered as constituting distributions of earnings of the corporation. He states that at the time of distribution the corporation did not need such capital since it had accumulated earnings sufficient for the conduct of its operations, and that such distributions should be considered as returns of the capital actually invested. However, as pointed out above, and as specifically provided in section 115 (g), an amount received in redemption of stock may be considered the distribution of a taxable dividend, whether or not the redeemed stock was issued as a stock dividend. See *Samuel H. Kessner*, 26 T. C. 1046, affirmed per curiam (C. A. 3); *Kirschenbaum* v. *Commissioner*, (C. A. 2) 155 F. 2d 23, which relies upon *Commissioner* v. *Bedford's Estate*, 325 U. S. 283; *Phelps* v. *Commissioner*, (C. A. 9) 247 F. 2d 156, affirming 26 T. C. 846.

In deciding whether, within the meaning of section 115 (g), a distribution is essentially equivalent to the distribution of a taxable dividend the decision must be made upon the facts of each individual case. It has been recognized that no sole test is decisive, and the issue must depend upon the net effect of the transaction. See *United States* v. *Fewell*, (C. A. 5) 255 F. 2d 496; *Samuel H. Kessner, supra; Flanagan* v. *Helvering*, (C. A. D. C.) 116 F. 2d 937; *Earle* v. *Woodlaw,*

(C. A. 9) 245 F. 2d 119, certiorari denied 354 U. S. 942. From a consideration of all the facts here presented, we think that each distribution must be considered essentially equivalent to the distribution of a taxable dividend within the meaning of section 115 (g).

The redemptions clearly did not represent partial liquidations of the corporation. There was no retrenchment or contraction of the business or of the .capital structure, particularly in view of the fact that the capitalization was immediately restored to its former amount by the capitalization of earnings and the issuance of a stock dividend. For this reason cases involving a contraction of the business, such as *Commissioner* v. *Sullivan*, (C. A. 5) 210 F. 2d 607, are not determinative.

The redemption of the preferred stock was pro rata between these two stockholders, and after the second redemption all the preferred stock had been retired and the petitioner and Graff each owned 500 shares of common stock. Thus, after each distribution the petitioner retained the same fractional interest in the corporation as before.

We perceive no corporate business purpose in the redemptions. They were not made because of the adequacy of a lesser capitalization. Indeed this was recognized by all parties concerned, and at the insistence of Ford Motor Company the capitalization was immediately restored to $30,000 through capitalization of earnings and issuance of a stock dividend.

We have given careful consideration to the petitioner's argument that he should not be held taxable for the reason that immediately upon the receipt of each distribution he was required to pay it over to Graff and that hence he enjoyed no enrichment. In our view the situation should not be considered as different from the situation which would have been presented had the petitioner initially subscribed for one-half of the preferred stock, as apparently was contemplated in the dealings with Ford Motor Company, or had, out of his own funds, purchased the stock from Graff, or had borrowed from a third party to purchase the stock from Graff. In any of such cases there would not have been "enrichment" in the sense that the petitioner had received anything over and above the amount of his investment. Yet we think that there can be no doubt that in such cases the petitioner would have received a taxable dividend.

It is not determinative that there might have been a different tax result had the preferred stock remained in the ownership of Graff and been redeemed from him by the corporation. We must, of course, decide the case upon the basis of the facts as they existed and not on the basis of facts which might have existed. Apparently the petitioner's purchase of the stock was done under the compulsion of his business arrangement with Ford Motor Company and, as stated, we

think that purchase must be recognized as such, with a consequent increase of basis for his total stock interest, which basis remains undiminished despite the redemption of the preferred stock.

*Decisions will be entered for the respondent.*