ROBERT W. CLEVELAND AND ANITA H. CLEVELAND, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ROYAL E. CLEVELAND AND ALVINA D. CLEVELAND, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 85101, 85102. Filed January 10, 1963.

*Robert P. Smith, Esq.,* and *Joseph W. Kiernan, Esq.,* for the petitioners.

*Herbert A. Seidman, Esq.,* and *Donald W. Howser, Esq.,* for the respondent.

HOYT, *Judge:* The respondent determined deficiencies in petitioners' income taxes for the years 1953 and 1954, as follows:

| Docket No. | Calendar year | Amount |
|---|---|---|
| 85101 | 1953 | $39,392.88 |
|  | 1954 | 36,418.80 |
| 85102 | 1953 | 39,942.36 |
|  | 1954 | 37,081.66 |

The issue for decision is whether four distributions made to the petitioners by Britton Contracting Co. were made in the course of liquidation under sections 115(c) and 115(i) of the 1939 Internal Revenue Code so as to be taxed as capital gains or were essentially equivalent to a dividend under sections 115(a) and 115(g) so as to constitute ordinary taxable income.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Robert W. Cleveland and Anita H. Cleveland, petitioners in Docket No. 85101, are husband and wife residing in Harrisburg, Pa. Royal E. Cleveland and Alvina D. Cleveland, petitioners in Docket No. 85102, are husband and wife residing in Camp Hill, Pa. Both couples filed their joint Federal income tax returns with the district director of internal revenue at Philadelphia, Pa.

The petitioners, Robert W. Cleveland and Royal E. Cleveland, owned and operated the Cleveland Bros. Equipment Co., which was engaged in the distribution and sale of heavy equipment, especially that manufactured by the Caterpillar Tractor Co. Subsequent reference to "petitioners" shall be to these two petitioners only.

Roy Clark was the president and sole shareholder of Britton Contracting Co. which was engaged in the pipeline construction business. He died on September 4, 1953, and his widow, Eunice Clark, and the Peoples First National Bank of Pittsburgh were appointed coexecutors of his estate.

On the date of Roy Clark's death, Britton was engaged in six pipe-line construction jobs. It had also been the low bidder on a construction contract for United Fuel Gas Co., but the job had been deferred until 1954 and no contract had been awarded to Britton. The nucleus of Britton had been Roy Clark, and until his death he ran a one-man show. As coexecutor, the bank concluded that due to the complexities of the business it should not be continued by the estate. Eunice Clark was primarily interested in preserving her husband's good name, but she was soon convinced that liquidation was the only proper course. About September 15 the then directors voted to direct their general manager to prepare for liquidation in the event it should become necessary. This resolution was never referred to in subsequent minutes of directors meetings, nor was it later rescinded. A few days later the manager wrote to a Pittsburgh concern withdrawing a bid on a pipeline construction job, which had not been accepted, saying that in view of changes in corporate organization, the proposal was withdrawn.

The estate received several offers for Britton's equipment, the highest of which was the petitioners' offer of $205,000. They were very anxious to obtain same as such equipment was in short supply at that time. This offer was refused but the executors tried to persuade petitioners to buy the stock of Britton. They were apparently persuasive and on October 23, 1953, petitioners bought all of said stock for $265,000. The agreement provided for payment in four installments as follows:

| Due date | Amount |
|---|---|
| Oct. 23, 1953 | $26,500 |
| Nov. 2, 1953 | 100,000 |
| Nov. 22, 1953 | 100,000 |
| Dec. 22, 1953 | 38,500 |
| Total | 265,000 |

It did not provide, however, that a liquidation be brought about, and petitioners were not bound to proceed to liquidate, although they discussed it with the executors. When the new officers and directors, selected by petitioners, took over a few days later and held their first meeting, they took no action with respect to liquidation. The minutes of their meeting show it was not even discussed.

Within a short time the petitioners concluded that they lacked the time and know-how to complete all of the pipeline construction work in progress. They persuaded James Fulghum, a business associate, to assist them, and he was elected president of Britton on November 2, 1953. As owner of the Fulghum Contracting Co., Fulghum had considerable experience in the pipeline business; he knew about the United Fuel Gas Co. job on which his own company had bid, and had advised petitioners to go after the contract. Again the new

officers and directors took no action to vote to liquidate at their November 2 meeting, and according to the minutes the matter of liquidation was not discussed then.

Fulghum accepted the job as president of Britton with the understanding that if Britton were able to obtain the contract with United, the petitioners would sell their Britton stock to him. If Britton did not get the contract, then Fulghum was to receive other compensation for his services to Britton. The plan and understanding was that petitioners were to get the proceeds from the sale of Britton's equipment to their customers and Fulghum was to get the United contract to perform.

With Fulghum's help, Britton was thereafter able to conclude or terminate all construction jobs then in progress. Various projects were sold or sublet, others were completed. As this occurred, employees at the jobsites were discharged. During the period from October 23, 1953, to October 1, 1954, Britton received in excess of $175,000 from these contracts. By December 31, 1953, most of Britton's machinery and equipment had been sold, and its office and warehouse at Washington, Pa., were closed, and employees there were discharged. After petitioners acquired all of Britton's stock, no new bids were made by Britton on other pipeline construction projects.

Britton made the following distributions to the petitioners as stockholders:

| Date of distribution | Amount |
| --- | --- |
| Nov. 23, 1953 | $80,000.00 |
| Dec. 17, 1953 | 38,500.00 |
| Jan. 19, 1954 | 26,500.00 |
| Feb. 8, 1954 | 94,661.52 |
| Total | 239,661.52 |

The first two distributions correspond closely in date and amount with the last two installment payments due from petitioners under their Britton stock purchase agreement with the Clark Estate. The petitioners had borrowed money to make the initial payments, and the final two payments were made substantially from the first two distributions received by petitioners from Britton. At the time of the distributions it was not known that there would be sufficient sums realized from corporate assets to satisfy corporate debts.

As of February 1, 1953, Britton's balance sheet showed earned surplus and undivided profits of $305,018.29, and as of January 31, 1954, $305,583.08. Britton had never paid a dividend to its shareholders.

On February 9, 1954, the 251 shares of Britton stock held jointly by the petitioners were surrendered to the corporation. Certificates for 12 shares each were then issued to the petitioners, and the other 227 shares were returned to the treasury of the corporation. Britton's

authorized capital stock was reduced from $25,100 to $2,400. Petitioners remained the sole stockholders, each still owning equal interests in Britton thereby.

Soon after the petitioners acquired control of Britton, Fulghum, their chosen president of the corporation, began negotiating with United Fuel for the purpose of obtaining the pipeline construction job originally bid by Britton. This was at the instance and direction of petitioners. Around December 9, 1953, as a result of these negotiations, Fulghum told the petitioners that the contract was theirs for the asking, and that if they wanted it they could have it. On that date, Fulghum wrote United on behalf of Britton giving assurances and saying, in part, as follows:

In answering your question as to the rumor that this Corporation is in the process of liquidation, I will assure you it is not. We still maintain our warehouse and office at Claysville, Pennsylvania, and will continue there. We closed the downtown office in Washington, Pennsylvania, as an economy measure and moved the office manager to Claysville, Pennsylvania.

At this time he was president of the corporation and had been the principal officer negotiating with United to obtain the large pipeline contract on which Britton had bid almost a year before. Three of the four distributions here involved were made after this time.

On April 1, 1954, Britton and United Fuel signed a written contract for the construction of two pipelines. Again, at this time, Fulghum, as president of Britton, wrote United with respect to the cancellation of a certain pipeline construction job saying that "We will certainly appreciate the opportunity of bidding this work when it comes up for construction again." He concluded by saying "we are certainly interested in bidding your work, no matter how large or small, that may arise in the future."

At the time the four distributions were made to the Cleveland brothers, Britton was planning to continue in business until it could procure and perform the United Fuel contract, which it was actively and aggressively seeking. Unlike the contracts which Britton had terminated, there was no obligation to United Fuel existing at the time the Britton stock was acquired by the Cleveland brothers, and it lay strictly in the realm of new business. This contract was for $1,751,198.79. Since Britton's gross receipts for 1953 were only $3,109,611.37, it is apparent that this United Fuel contract was quite sizable when compared to Britton's usual business operation.

In order for Britton to carry out its contract with United Fuel, it was necessary to rent machinery and equipment. The rental payments made by Britton over the 6 or 7 months required for the United Fuel job amounted to $320,273.25. On the other hand, the total sales price for all the old Britton equipment was only $307,584.07. By

comparison it is clear that the United Fuel contract necessitated the employment and use of a substantial quantity of equipment.

We find that this was a major business transaction and not a part of, or incidental to, the later liquidation which followed and was completed several years later.

We find also that despite the earlier termination of existing contracts and the sale of machinery, Britton did not intend to liquidate until after the United Fuel contract was completed. An intention to liquidate was not extant when the distributions from Britton were made to petitioners in late 1953 and early 1954. On the contrary, the Britton company then intended to obtain and perform that very large new contract in its usual line of business activity.

In accord with their earlier understanding with Fulghum as to his employment by Britton, the petitioners executed a contract for the sale of their Britton stock to Fulghum on August 15, 1954. The actual assignment of interest under the contract was on October 1, 1954, and at that time the contract with United Fuel had been substantially completed. Again, although petitioners contend that there was an agreement by Fulghum to liquidate, the written agreements are completely silent about this.

During the period from June 1 to November 30, 1954, Britton's authority to conduct business was withdrawn in five States. There is nothing to show when it was withdrawn in West Virginia, where United was located, or in Pennsylvania, where Britton had its principal place of business. However, no further pipeline construction contracts were obtained or performed by Britton after the United job was completed. Its final dissolution was concluded on December 18, 1957, after all claims and obligations had been discharged.

### OPINION.

The sole issue is whether the four distributions by Britton Contracting Co. to the petitioners were liquidating distributions within the meaning of sections 115(c) and 115(i), or whether they were essentially equivalent to a dividend under sections 115(a) and 115(g) of the 1939 Code.

Amounts distributed in partial or complete liquidation receive capital gains treatment by virtue of section 115(c). The term "dividend" does not apply to these liquidating distributions. Sec. 39.115(a)–1(c), Regs. 118. The petitioners claim that since there was eventually a complete liquidation of Britton, the distributions were part of a series of distributions in liquidation within the meaning of section 115(i).

Although section 115(i) defines the phrase "amounts distributed in partial liquidation," the term "liquidation" is not defined in the 1939

Code. This court defined the term in *T. T. Word Supply Co.*, 41 B.T.A. 965, 980 (1940), as follows:

The liquidation of a corporation is the process of winding up its affairs by realizing upon its assets, paying its debts, and appropriating the amount of its profit and loss. It differs from normal operation for current profit in that it ordinarily results in the winding up of the corporation's affairs, and *there must be a manifest intention to liquidate, a continuing purpose to terminate its affairs and dissolve the corporation, and its activities must be directed and confined thereto.* A mere declaration is not enough, and the question whether a corporation is in liquidation is one of fact. * * * [Emphasis added.]

The fact that no formal plan of liquidation was adopted has some weight but is not decisive. *J. Paul McDaniel*, 25 T.C. 276 (1955), acq. 1956–1 C.B. 4; *Burnside Veneer Co.*, 8 T.C. 422 (1847), affd. 167 F. 2d 214 (C.A. 6, 1948). The real question here is whether, after the petitioners bought their stock, Britton was in liquidation and its activities were confined to the winding up of its affairs. At the time of the distributions to petitioners in the period from November 23, 1953, to February 8, 1954, Britton was actively seeking the very large and lucrative United Fuel contract, which it later obtained. Such activity certainly does not manifest a continuing purpose to terminate all business and confine corporate activities to the winding up of its affairs. The termination of its existing contracts, the discharge of various employees, and the sale of its machinery indicate a business contraction and winding up, but this is illusory in the light of the United Fuel contract. There was no substantial or real contraction of business since it was known that other employees and an even greater amount of machinery and equipment would soon be needed for the United Fuel job, and the size of that contract was such as to manifest an intention to continue actively in its usual business operations, at least until that big job was finished.

The fact that a liquidating corporation engages in some new business does not always preclude a liquidation. In *R. D. Merrill Co.*, 4 T.C. 955 (1945), the corporation acquired additional timberland during the period of liquidation. However, the Court found that this was "a minor transaction * * * and its purchase was incidental to and of assistance in the logging of other timber." Also, in *Rollestone Corporation*, 38 B.T.A. 1093 (1938), the liquidating corporation engaged in some drilling operations which the Court found "insignificant and unimportant." The contract with United Fuel, however, would provide receipts in excess of 50 percent of Britton's total receipts for the year 1953. The size and consequent importance of this contract is patent. It was neither a minor transaction nor, as we have found, was it incidental to the liquidation process.

While Fulghum denied at the trial that the statements he made in attempting to get this new business were correct, his explanation for making them in 1953 were neither clarifying nor satisfactory, and

the fact remains that he did make them on behalf of Britton just at the time that petitioners contend the corporation was making "liquidating" distributions to them. Also at the trial, Fulghum testified that his statements that Britton wished to bid on future contracts were incorrect, but his explanation for having made them in 1954 was evasive and unsatisfactory. The fact remains that his letter to United was written by him as principal officer of Britton and these were his statements made in 1954. There is ample evidence in the record without relying on these statements of Britton's president to support our finding that Britton was not in liquidation, in the tax sense, when the distributions to petitioners were made. They are nonetheless relevant, material and significant, even if untrue as claimed by Fulghum at trial, to support our finding that Britton intended to obtain and perform substantial new business and was actively and aggressively seeking to procure the United Fuel contract when the distributions to petitioners were being made. The ardor with which such new business was being sought is demonstrated if the statements were lies as contended by petitioners. Petitioners' argument that unless we find that these statements were true they are immaterial and should not be considered is without merit. We find inadequate support in the record for the petitioners' contention that the procurement of the United Fuel contract was part of the liquidation, necessitated by the discovery of numerous unknown claims during the months of February and March of 1954. Britton went after the contract and received word that it was assured in early December of 1953. The claims were all known prior to the time of distribution except for one for $5,000 and one for $10,000. Neither of these was settled until 1957. There was one large claim by Huron County, Ohio, but this was not discovered until after the United Fuel contract had been obtained and about the time the written contract was signed. The facts do not support petitioners' argument that Britton went after and obtained this sizable new business because of the discovery of unknown claims, and because it was therefore necessary to complete the liquidation.

We hold that Britton was not in the process of liquidation at the time of the distributions and that it remained a going concern until after the United Fuel contract was performed.

Having decided that the distributions do not come within the ambit of section 115(c), we must determine whether or not they are essentially equivalent to a dividend as provided in sections 115(a) and 115(g).

Whether or not a distribution is essentially equivalent to a dividend is a question of fact which depends on the circumstances of each case. *Genevra Heman*, 32 T.C. 479 (1959), affd. 283 F. 2d 227 (C.A. 8, 1960) ; sec. 39.115(g)–1(a)(2), Regs. 118. The determining criterion

is whether the net effect of the transactions was to distribute accumulated earnings and profits among the shareholders in the same manner as a cash dividend. *Kessner* v. *Commissioner*, 248 F. 2d 943 (C.A. 3, 1957), affirming per curiam 26 T.C. 1046 (1956); *James F. Boyle*, 14 T.C. 1382 (1950), affd. 187 F. 2d 557 (C.A. 3, 1951), certiorari denied 342 U.S. 817 (1951); *Flanagan* v. *Helvering*, 116 F. 2d 937 (C.A.D.C. 1940), affirming a Memorandum Opinion of this Court. Many criteria have been used by the courts in making this determination, but the vital fact here is that the essential relation of the taxpayers to the corporation was left unaltered. *Kessner* v. *Commissioner, supra; Samuel Towers*, 24 T.C. 199 (1955), affd. 247 F. 2d 233 (C.A. 2, 1957), certiorari denied 355 U.S. 914 (1958). We regard the "net effect" test of a redemption as no more than a rule that requires consideration of all the circumstances of a case. *J. Paul McDaniel, supra.*

Here the distributions were initiated by the shareholders without any apparent corporate business purpose. This is clearly demonstrated by their timing. In view of the known outstanding liabilities of and claims against Britton, these distributions could well have been to the corporate detriment. They were simply self-serving distributions to the petitioners which in no way changed their relation to the corporation. The net effect was to distribute accumulated earnings and profits among Britton's sole shareholders. It may well be that petitioners did not intend or understand the tax consequences which resulted, but on the whole record we cannot determine that the payments were made in liquidation of Britton Contracting Co.

We hold that the payments made by Britton to petitioners were not liquidating distributions under sections 115(c) and 115(i) but instead they were essentially equivalent to a dividend within the meaning of sections 115(a) and 115(g) and must be taxed accordingly.

*Decisions will be entered for the respondent.*