335 F.2d 473
 64-2 USTC P 9689
 Robert W. CLEVELAND and Anita H. Cleveland, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Royal E. CLEVELAND and Alvina D. Cleveland, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 14511-14512.
 United States Court of Appeals Third Circuit.
 Argued Jan. 9, 1964.
Decided Aug. 10, 1964.
 
 Joseph W. Kiernan, Washington, D.C. (Smith, Ristig & Smith, Washington, D.C., on the brief), for petitioners.
 William A. Geoghegan, Dept. of Justice, Washington, D.C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Arthur E. Strout, Attys., Dept. of Justice, Washington, D.C., on the brief), for respondent.
 Before STALEY, HASTIE and SMITH, Circuit Judges.
 WILLIAM F. SMITH, Circuit Judge.
 
 
 1
 These cases are before the court on petitions to review a decision of the Tax Court, 39 T.C. 657. The question for decision is whether the Tax Court erred in its determination that four disbursements of corporate funds, made in connection with the redemption of stock, 'were not liquidating distributions' within the meaning of 115(c) and (i) of the Internal Revenue Code of 1939, 26 U.S.C.A., but were 'instead * * * essentially equivalent to (dividends) within the meaning of' 115(a) and (g) of the Code. The determination is challenged as clearly erroneous and not in accord with the law.
 
 
 2
 The petitioners Robert W. Cleveland and Royal E. Cleveland were, and had been for many years prior to 1953, the sole owners and operators of Cleveland Brothers Equipment Co., a corporation engaged in the distribution and sale of heavy equipment, particularly of the type used in the construction industry. Each of them also owned, during the period here in question, twenty per cent of the capital stock of the Apex Constructing Company, a corporation engaged in the rental and sale of reconditioned construction equipment. The principal stockholder of the Apex Company was one James Fulghum, who held forty per cent of the outstanding shares. The said James Fulghum was also the owner of the Fulghum Contracting Corporation, which was, and had been prior to 1953, engaged in the business of pipe line construction. The significance of these intercorporate relationships will appear when viewed in the light of the facts hereinafter summarized.
 
 
 3
 The Britton Contracting Company, a corporation maintaining its principal place of business in Washington, Pennsylvania, was engaged in the business of pipe line construction. The sole stockholder of the said corporation had been one Roy Clark, who died on September 4, 1953; at the time of his death he held 251 shares of capital stock, each share of a par value of $100. At the time of Clark's death the Britton Company held six contracts for the construction of pipe lines, the work on which was in a state of partial completion. There was also outstanding a bid, submitted to the United Fuel Gas Company early in 1953, under the terms of which the Britton Company had offered to construct two pipe lines at a total cost slightly in excess of $1,751,000. For reasons not here relevant the United Company deferred action on the bid until 1954, but had assured Clark that when the contract was awarded the Britton Company would be given first consideration. It should be noted that the Fulghum Corporation had also submitted a bid to perform the work but at a higher price.
 
 
 4
 The executors of Clark's estate, because of their lack of knowledge and experience in the construction field, decided that it was not feasible for them to carry on the business and agreed that it should be liquidated. Accordingly, the directors of the Britton Company resolved to prepare for liquidation. Thereafter the petitioners made an offer to purchase the construction equipment for a price of $205,000, but this offer was rejected. Thereupon the petitioners, after negotiations with the executors, entered into an agreement to purchase the capital stock for a price of $265,000, payable in installments as follows:
 
 
 5
 October 23, 1953 ... $ 26,500
November 2, 1953 .... 100,000
November 22, 1953 ... 100,000
December 22, 1953 .... 38,500
 
 
 6
 The purchase agreement contained no provision for the liquidation of the corporate business although this prospect had been discussed with the executors. The new officers and directors of the Britton Company met several days after the petitioners had acquired the stock but they took no action with respect to a plan of liquidation; in fact, such a plan was not even discussed.
 
 
 7
 Within a short time after they had acquired the stock of the Britton Company, the petitioners, having concluded that they lacked the requisite knowledge and experience to complete the construction work then in progress, solicited the services of James Fulghum, their business associate in the Apex Company. As the former associate of Clark, and as onwer of the Fulghum Corporation, Fulghum had a wide experience in the construction of pipe lines. He was also familiar with the bid which the Britton Company had submitted to the United Company. He assured the petitioners that the contract was a 'plum' and they agreed that they would make an effort to obtain it. Fulghum agreed to become an associate of the petitioners and became vice president of the Britton Company on November 2, 1953. Again the officers and directors of the Company met but took no action on a plan of liquidation.
 
 
 8
 As a condition of Fulghum's acceptance of the vice presidency of the Britton Company it was agreed that: first, the petitioners would retain the right to sell the equipment at prices acceptable to them; second, an endeavor would be made to obtain the contracts with the United Company on the basis of the bid submitted by Clark early in 1953; third, if the contracts were awarded to the Britton Company the petitioners would sell their stock to Fulghum; and fourth, if their endeavor to obtain the contracts was not successful Fulghum would be compensated for his services. These conditions were met, as will hereinafter appear.
 
 
 9
 Between October 23 and December 31 of 1953, the equipment was sold and, on more than fifteen individual sales, the Britton Company realized a total sum slightly in excess of $307,000. The largest individual sale, except for one made to another customer, was one in the amount of $100,000, made to the Apex Company, in which the petitioners held a forty per cent interest.[1] During the period between October 23, 1953 and October 1, 1954, the Britton Company completed the work under three contracts, in effect at the time of Clark's death, and was paid a sum in excess of $175,000. The other contracts were either terminated or sublet. As the work in progress was completed many of the employees were laid off. However, it appears from the evidence that the curtailment of business prior to April 1, 1954, when the Britton Company was awarded the pending contract by the United Company, resulted from a lack of work.
 
 
 10
 As of February 1, 1953, seven months prior to Clark's death, the balance sheet of the Britton Company reflected earned surplus and undivided profits in the amount of $305,018.29. It should be noted that during Clark's regime the Company had never paid a dividend. As of January 31, 1954, the Company's balance sheet showed earned surplus and undivided profits in the amount of $305,583.08, a difference slightly in excess of $500. The last disbursements to the petitioners, in the amount of 94,661.52, was made on February 8, 1954, infra.
 
 
 11
 Disbursements in the total amount of $239,661.52 were made to the petitioners as follows:
 
 November 23, 1953 .. $80,000.00
 December 17, 1953 ... 38,500.00
 January 19, 1954 .... 26,500.00
 February 8, 1954 .... 94,661.52
 
 12
 When these disbursements were made the officers of the Britton Company were actively and aggressively engaged in an effort to procure the United Company contracts, a course of conduct somewhat inconsistent with the alleged intention to liquidate the business. The Tax Court found that these distributions were initiated by the petitioners, as shareholders, 'without any apparent corporate business purpose.'
 
 
 13
 On February 9, 1954, 251 shares of Britton Company stock, held jointly by the petitioners, were surrendered to the corporation and in return each of the petitioners received a certificate for 12 shares. The remaining 227 shares, previously held by the petitioners, were not cancelled but were held by the Company as treasury stock. This transaction effected a change in capital structure but in no way altered the relationship of the petitioners to the corporation or their proportionate interest in it. The ownership of the corporation remained as it had been prior to the stock redemption.
 
 
 14
 Soon after Fulghum was made an officer of the Britton Company, he opened negotiations with the officials of the United Company in an effort to obtain the contract to construct the pipe lines. While the negotiations were pending the officials of the United Company raised a question as to whether the business of the Britton Company was to be liquidated. As a result of an inquiry the Britton Company, over the signature of Fulghum, addressed a letter of explanation to the vice president of the United Company.
 
 
 15
 This letter, dated December 9, 1953, read in pertinent part as follows:
 
 
 16
 'In answering your question as to the rumor that this Corporation is in the process of liquidation, I will assure you it is not. We still maintain our warehouse and office at Claysville, Pennsylvania, and will continue there. We closed the downtown office in Washington, Pennsylvania as an economy measure and moved the office manager to Claysville, Pennsylvania.'
 
 This letter stated further:
 
 17
 'Due to certain tax advantages, this Corporation will certainly continue in operation and naturally the personnel will stay intact as much as possible as in any construction company.'
 
 
 18
 At the hearing before the Tax Court, Fulghum denied the correctness of the statements contained in the letter and offered an explanation which was found 'neither clarifying nor satisfactory.'
 
 
 19
 The contract in question was awarded to the Britton Company on April 1, 1954, at which time Fulghum agreed to the cancellation of another contract. The cancellation was confirmed by letter dated April 5, 1954, in which Fulghum wrote, as vice president of the Britton Company, as follows:
 
 
 20
 'This letter will confirm our meeting in your office Thursday, April 1, 1954 at which time the writer agreed to cancel our Contract on your 20' pipe line in Jackson and Wood Counties, West Virginia. We will certainly appreciate the opportunity of bidding this work when it comes up for construction again.'
 
 
 21
 At the hearing before the Tax Court, Fulghum attempted to explain this letter but his explanation was found 'evasive and unsatisfactory.'
 
 
 22
 The work on the project commenced shortly after the contract was awarded. During the progress of the work the Britton Company rented equipment at a cost of $320,273.25, of which the amount of $241,608.41 was paid to the Fulghum Corporation, wholly owned by Fulghum, which was, and had been prior to 1953, engaged in the pipe line construction business. The amount paid to the Fulghum Corporation represented approximately seventy-five per cent of the total rental costs. In the light of these facts, the real reason for the sale of the Britton Company equipment is not difficult to detect. Since the Fulghum Corporation was the owner of the equipment necessary to complete the work in progress at the time of Clark's death and the work to be performed under the United Contract, there was no need for the Britton Company to retain its equipment, the sale of which served only to give to the intercorporate transactions a superficial but misleading appearance that the Britton Company was in the process of liquidation.
 
 
 23
 In accordance with their earlier understanding, petitioners, on August 15, 1954, agreed to sell their stock in the Britton Company to Fulghum for $126,000, the price being computed on the basis of the company's financial condition as of May 1, 1954. The assignment of the stock under the agreement was effected on October 1, 1954, when the work under the United Company contract had been substantially completed. Thereafter the Britton Company undertook no new work and, after all valid claims and obligations had been discharged, was finally liquidated by dissolution on December 18, 1957. The fact that the Britton Company solicited no new business is of no significance.
 
 
 24
 On the basis of the findings of fact stated in its opinion, and herein only partially summarized, the Tax Court concluded: first, that the Britton Company was not in liquidation at the time the disbursements here in question were made; second, that the Company remained a going concern until after the United Company contract was performed; and third, that the payments made to the petitioner were essentially equivalent to a dividend within the meaning of the pertinent provisions of the statute. The petitioners herein argue that these conclusions are not in accord with the law.
 
 
 25
 We have here a situation in which there have been disbursements of corporate funds pursuant to an arrangement between the corporation and its only shareholders, the beneficiaries of the disbursements. The transactions involved in such situations should be subjected to close scrutiny to ensure that what was essentially equivalent to the distribution of taxable dividends are not accorded tax treatment as liquidating distributions.
 
 
 26
 This court and others have uniformly held that whether a corporate distribution was essentially equivalent to a taxable dividend within the meaning of 115(a) and (g) of the Code, supra, or a liquidating distribution within the meaning of 115(c) and (i), supra, is a question of fact to be determined by the Tax Court. Ferro v. Commissioner of Internal Revenue, 242 F.2d 838, 840 (3rd Cir. 1957); Boyle v. Commissioner of Internal Revenue, 187 F.2d 557, 560 (3rd Cir. 1951), cert. den. 342 U.S. 817, 72 S.Ct. 31, 96 L.Ed. 618; Smith v. United States, 121 F.2d 692, 695 (3rd Cir. 1941); Earle v. Woodlaw, 245 F.2d 119, 128, 129 (9th Cir. 1957), cert. den. 354 U.S. 942, 77 S.Ct. 1400, 1 L.Ed.2d 1537; Commissioner of Internal Revenue v. Roberts, 203 F.2d 304, 306 (4th Cir. 1953). The recognized criterion which must be applied in the determination of the issue is the net effect of the distribution rather than the motives of either those who initiated it or the officers of the corporation. Ibid.
 
 
 27
 Application of the criterion requires a consideration of many factors, including the following: (1) whether earned surplus and undivided profits were available for dividends; (2) prior dividend history of the corporation; (3) whether the distribution resulted in any substantial change of ownership or the proportionate interests of the shareholders; (4) whether the distribution was initiated by the corporation or by its shareholders; (5) whether there was any substantial contraction in corporate business; and (6) the effect of the distribution on corporate finances as compared with the payment of regular dividends. Ferro v. Commissioner of Internal Revenue, supra; United States v. Fewell, 255 F.2d 496, 500 (5th Cir. 1958). It is evident from the record in this case that the ultimate decision of the Tax Court was based upon a fair consideration of the enumerated factors.
 
 
 28
 The only question for our decision is whether there exists in the record an adequate evidentiary basis for the ultimate determination made by the Tax Court. Ferro v. Commissioner of Internal Revenue, supra, 242 F.2d 840. It is well settled that a decision of the Tax Court is conclusive unless it appears from an examination of the record in its entirety that the findings of fact were clearly erroneous or that its decision was not in accord with the law. Carpenter v. Commissioner of Internal Revenue, 322 F.2d 733, 736 (3rd Cir. 1963) and the cases therein cited, cert. den. 375 U.S. 992, 84 S.Ct. 631, 11 L.Ed.2d 478. The 'judicial function is exhausted when there is found to be a rational basis for the conclusions' reached by the Tax Court. Dobson v. Commissioner, 320 U.S. 489, 501, 64 S.Ct. 239, 246, 88 L.Ed. 248 (1943). Upon an examination of the record in this case we are convinced that the Tax Court's findings of fact are supported by substantial evidence and its decision is in accord with the law.
 
 
 29
 The decision of the Tax Court will be affirmed.
 
 
 
 [1]
 Deducting reserve for depreciation from original cost, this sale resulted in the loss of $184,494, representing approximately seventy-four per cent of the total loss sustained on the sale of all equipment