JOHN L. SULLIVAN, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 23026, 23027, 23028, 23029.   Promulgated February 29, 1952.

*Dorothy Ann Kinney, Esq.,* for the petitioners.

*D. Louis Bergeron, Esq.,* and *L. R. Van Burgh, Esq.,* for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith : Georgia E. Sullivan, Docket No. 23027 ; B. C. Garnett, Docket No. 23028 ; and Betty K. S. Garnett, Docket No. 23029.

## OPINION.

MURDOCK, *Judge:* The Commissioner maintains that the distribution made by Texon on April 1, 1943, was "at such time and in such manner as to make the distribution and cancellation  *  *  *  in part essentially equivalent to the distribution of a taxable dividend" within the meaning of section 115 (g), so that the distribution is taxable as a dividend to the extent that accumulated earnings of Texon were available. The petitioners contend that the distribution does not come within that section and the entire amount must be treated as in payment for the stock under section 115 (c). The Court, after considering the entire record, has come to the conclusion that section 115 (g) does not apply since the corporation did not cancel or redeem its stock at such time and in such manner as to make the distribution and cancelation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend. This result follows

whether regard is had to the net effect of the transaction, to the motives and purposes of the corporation and its stockholders, or to a combination of the two.

Business purposes and motives dictated by the reasonable needs of the business occasioned the distribution. It was not made to avoid taxes or merely to benefit the stockholders by giving them a share of the earnings of the corporation. The corporation did not regard itself as being in position to declare a taxable dividend. These properties needed to be developed through drilling. They were in a high pressure field. A suit for damages from a blow-out which occurred in prior operations in that field was pending against Texon at the time of the distribution. Texon had no authority under its charter to drill and did not want to subject its other properties to possible liability in the development of these leases. The partial distribution was to protect its remaining leases. Cf. *L. M. Lockhart*, 8 T. C. 436. The stock redeemed in 1943 was originally issued in 1937 for a legitimate business purpose, although the subsequent distribution somewhat undid the result accomplished at that time. There is no relationship between the issuance of the stock and its redemption which would tend to make the latter resemble an ordinary dividend. The stockholders assumed a part of the indebtedness of the company secured by the leases. Cf. *L. M. Lockhart, supra.* The principal business of Texon had been that of producing oil. The distribution relieved it of properties which it did not need in that business and some of which it did not use. Cf. *Pullman, Inc.*, 8 T. C. 292; *James F. Boyle*, 14 T. C. 1382, affd. 187 F. 2d 557, certiorari denied 342 U. S. 814; *Elwood W. McGuire*, 32 B. T. A. 1075, affd. 84 F. 2d 431, certiorari denied 299 U. S. 591.

The gas payments and the notes were included in the distribution to furnish the distributees with capital and credit which they would need for the development of the properties. The notes represented money withdrawn by John L. Sullivan from Texon. He, through the community, was a part owner of some of the stock redeemed. Thus, the cancelation of the stock reduced the indebtedness of a stock owner to the corporation. Cf. *Bona Allen, Jr.*, 41 B. T. A. 206. The Sullivans and Garnetts proceeded with the development of the leases soon after the distribution. The drilling equipment was transferred by them to a new corporation, the stock of which was held equally by Georgia and Betty and the remaining assets were transferred to a new partnership composed of the two. The drilling equipment, being all of such equipment owned by Texon, was transferred because Texon had no further use for it and because it would be needed by the distributees in order to develop the high pressure leases. There were business reasons for the distribution of the drilling equipment.

There is no particular significance in the fact that the distribution was pro rata or that the corporation had never declared any regular dividends. There is ample evidence that the corporation did not intend this particular distribution as an ordinary dividend from accumulated earnings. The Commissioner has not called the attention of the Court to any circumstances or authorities which really support his determination that section 115 (g) applies.

The holding that section 115 (g) does not apply to the distribution of April 1, 1943, disposes of the main issue in the case since the parties are agreed upon the fair market value of the properties which were the subject of the distribution and the briefs indicate that they are also in agreement upon the amount of cost of the stock to be offset against the distribution in computing the capital gains. The respondent, on page 40 of his brief, says that the applicable cost in each case is $41,410.44 and the petitioners, at page 84 of their brief, contend that that same amount is the proper amount in each case. The parties disagree as to the accumulated earnings of Texon, but the question thus raised as an alternative issue need not be decided unless it is first determined that the transaction comes within section 115 (g).

The petitioners contend that the Commissioner has misread and likewise misapplied section 117 (j) (2). The portion of that provision under consideration is as follows:

GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months.

The effect of the returns filed by the petitioners was to deduct in full losses of $2,277.04 (from sales of two horses) and $2,829.16 (from the death of a horse). The Commissioner, in determining the deficiencies, regarded the loss from the death of the horse as a loss from an involuntary conversion. He also considered the horses to be property used in the racing business of the petitioners. The petitioners agree with the Commissioner that the race horses were property used in the business of the petitioners within the meaning of section 117 (j) (1). The petitioners reported long term gains for 1943 on sales of capital assets held for more than 6 months. Those gains, giving effect to the holding on the main issue, were substantially in excess of losses of the type mentioned in section 117 (j) (2). The Commissioner, in order to "consider" the losses on the horses losses from sales "of capital assets held for more than 6 months" within the meaning of section 117 (j) (2), offset against those losses all of the gains from sales of capital

assets held for more than 6 months. The petitioners contend that he had no authority to do that since the only gains from capital assets to be added in the formula of section 117 (j) (2) are those resulting from the compulsory or involuntary conversion of such assets, not those from free sales. All of the capital gains of the petitioners were from free sales and none were from the compulsory or involuntary conversion of capital assets. The Commissioner has read and applied that provision as if it were in the following form:

> If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business *into other property or money* and the *recognized gains upon sales or exchanges* of capital assets held for more than 6 months, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months.

The words "into other property or money" appear after, not before, the mention of capital assets and refer to all of that part of the sentence after the word "plus." The other underlined words do not appear at all. The Commissioner's interpretation of section 117 (j) (2) is untenable and is contrary to his Regulations 111, section 29.117–7. A proper interpretation is that not all gains on capital assets held for more than 6 months are to be considered for the purpose of section 117 (j) (2) but only the recognized gains from the compulsory or involuntary conversion of capital assets held for more than 6 months into other property or money. The petitioners had no such gains in 1943. The section does not apply. The petitioners correctly reported their losses on the race horses.

*Decisions will be entered under Rule 50.*