Maurice Weinman v. Commissioner.
Weinman v. Commissioner
Docket No. 55022.
United States Tax Court
T.C. Memo 1956-229; 1956 Tax Ct. Memo LEXIS 64; 15 T.C.M. (CCH) 1195; T.C.M. (RIA) 56229; October 15, 1956
*64 Benjamin Mahler, Esq., 39 Broadway, New York, N. Y., for the petitioner. Charles M. Greenspan, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in income tax for 1946 of $9,319.35. Petitioner suffered a net operating loss in 1948 which was allowed as a carry-back in 1946. The principal issue is whether respondent erred in reducing this net operating loss carry-back by treating a distribution from a wholly owned corporation during 1948 as a taxable dividend to petitioner to the extent of corporate earnings and profits. Petitioner raises alternative issues concerning the statute of limitations if the principal issue is decided adversely: whether any deficiency based on adjustments to 1946 income items, aside from the net operating loss carry-back, is barred; and whether respondent may use adjustments to 1946 income items as offsets against the 1948 loss carry-back. Respondent concedes, on brief, that any deficiency in excess of $8,134.05, the amount of the 1946 overassessment resulting from the earlier allowance of the 1948 carry-back, is barred. Petitioner insists that an additional $479.46 *65 is also barred. By amended pleading, petitioner asserts that respondent is estopped from determining any deficiency for 1946. Other issues, even if adequately raised, have apparently been abandoned. Findings of Fact Some facts were stipulated and are hereby found. Petitioner, an individual who conducted his business during the years involved from a New York City address, kept his books and filed his returns on a calendar year basis. He filed his 1946 individual income tax return and his 1948 joint individual income tax return with the collector of internal revenue for the second New York district. Petitioner dealt in and exported secondhand clothing. He had been in that business for 35 years. As an individual proprietor his gross sales for 1945 through 1954 were as follows: 1945
$733,648.41
1946
953,527.96
1947
738,649.48
1948
163,383.91
1949
None
1950
None
1951
None
1952
155,163.36
1953
296,156.41
1954
267,215.05
During World War II petitioner exported only 5 or 10 per cent of his goods sold, since foreign markets were sharply restricted. The United States Government, his chief customer, purchased the remainder. On August 6, 1945 petitioner *66 organized Weinman Export Clothing Corp., hereafter referred to as Export, under the laws of the State of New York. Export's charter allowed it to engage in all aspects of the secondhand clothing business, including exporting and importing. Petitioner, at all times, owned 100 per cent of the outstanding stock. Export kept its books and filed its returns for the fiscal years ended July 31. At the close of the war petitioner held a large accumulation of merchandise. He organized Export to use in conjunction with his individual operations in developing foreign markets. In connection with the incorporation of Export, petitioner's attorney, who was also his accountant, purchased stock records, stock certificates and a minute book. He handled the first meeting of the incorporators, prepared the minutes, had stock certificates issued, and gave the documents to petitioner. Petitioner received $45,000 of Export's capital stock in exchange for merchandise on July 31, 1945. He received additional stock when his $5,000 loan to Export was canceled. Entries to this effect were made in Export's journal. Export's stock records, stock certificates and minute book were lost in a fire in 1946. *67 Upon incorporation petitioner's accountant who was licensed to practice before the Treasury Department became Export's accountant and tax adviser. His duties included general auditing, preparation of financial statements, and preparation of income tax returns. He did not examine inventories. From 1945 through 1947 petitioner and Export both engaged in the secondhand clothing export business. Petitioner concluded that establishing another corporation would facilitate the filling of orders to be solicited abroad by him for Export. When his intentions were revealed to his foreman the latter offered to participate in the new corporation. They each agreed to subscribe for equal amounts of stock, petitioner to contribute merchandise and property worth $25,000, the employee to pay $25,000 cash. On August 19, 1947 they incorporated Weinman Merchandising Corporation, hereafter referred to as Merchandising, with authorized capital of 100 shares of no-par stock. Each stockholder subscribed for 25 shares. The two stockholders and Merchandising agreed that the corporation would buy only such clothing as needed to fill orders from Export. Petitioner agreed to lease the lower floors of his *68 New York City business premises to Merchandising at a $6,000 annual rental. The agreement also provided: "It is recognized that Weinman has been engaged in a similar business for many years and that his experience and knowledge in this business is such that his entire time will not be required and that he may devote himself to other and allied businesses without any restriction, provided, however, they are not in conflict with or in any way detrimental to the business of the Corporation [Merchandising]." The agreement further provided for dissolution of Merchandising within 60 days after the request of either stockholder. Export and Merchandising entered into an agreement by which Export agreed to place all orders for secondhand clothing with Merchandising. Merchandising agreed to buy, clean, fumigate, grade, repair, pack, and ship the clothing to fill those orders and to work exclusively for Export. Petitioner's attorney and the attorney for the other stockholder prepared the agreements jointly. Petitioner's attorney believed that the agreements did not prevent petitioner from individually engaging in the business of making sales of secondhand clothing. Export's entire *69 staff, excepting office personnel, was taken over by Merchandising. Petitioner went to Europe in October 1947 and returned in April 1948. On behalf of Export, he obtained orders which he forwarded to Merchandising. That corporation bought, processed, and shipped the clothing directly to the buyers. Merchandising was to receive 90 per cent of the price charged the foreign buyer by Export less deductions for commissions, freight, and insurance paid by Export. Most shipments were made by Merchandising against sight draft with bill of lading attached. On July 31, 1947 Export had an inventory totaling $87,168.12 stored on the upper floors of the building whose lower floors were later leased to Merchandising. Petitioner and the other stockholder agreed in 1947 that this inventory was to be used to fill orders from Export whenever possible, before new purchases were made. Export retained 90 per cent of the proceeds of sales from the inventory with 10 per cent going to Merchandising. From September 25, 1947 to June 30, 1948 Merchandising used goods which sold for $32,462 from the Export inventory in filling Export orders. The remainder of the goods sold consisted of those purchased *70 by Merchandising. Gross sales of Export aggregated $702,831.17 for the fiscal year ended July 31, 1948. Export's purchases, consisting of 90 per cent of the amounts on sales invoices of all goods purchased by Merchandising, aggregated $586,541.11 for that year. While petitioner was abroad he realized that relatively little of Export's inventory was being disposed of through Merchandising. When he forwarded one large order, he specifically requested that it be filled first from the Export inventory and then from purchases by Merchandising. Export owed accounts payable of $20,637.49 and loans payable of $43,400 on August 1, 1947 but only $5,811.25 of accounts payable and no loans payable on July 31, 1948. Export's fiscal year 1947 return stated the reason for retention of earnings and profits as: "No working capital - funds needed to pay debts." From 1945 through 1949 petitioner controlled the affairs of Export. He referred orders on which payment was to be made in dollars, generally on sight draft, to Export for filling. Petitioner secured some of those orders from former personal customers. When orders were shipped on consignment or on open account to be sold at a price negotiated *71 after arrival, or for sale against blocked funds, petitioner handled the transactions personally. Export could have filled those orders. Petitioner believed that orders should be procured for Export only where payment would be by means of letters of credit, so as not to involve others in the attendant risks. The other shareholder of Merchandising did not share those views. Upon returning to the United States petitioner determined to liquidate the Export inventory. He discussed the inventory with his attorney and his employees. Petitioner and the attorney felt that the inventory was then unproductive and that consignment sale directly by petitioner was the most desirable means of disposal. While in Europe petitioner arranged, with others, for a large transaction with the French Government to allow importation of secondhand clothing into French colonies on consignment against blocked francs. Petitioner determined to liquidate the remaining Export inventory in filling this order. Petitioner and his accountant arranged to make the Export inventory available to petitioner. Petitioner also purchased about $100,000 of additional merchandise for that order. This transaction resulted in *72 petitioner's incurring a substantial loss. On the Export books, surplus was charged with $13,631.89, which was transferred to capital stock as a stock dividend. Export reported a stock dividend on its fiscal year 1948 tax return. Export issued no additional stock certificates. On that same date, April 30, 1948, another entry debited "Capital Stock Issued" and credited purchases for $45,000, explained as an entry to reduce capital stock. On petitioner's personal books $45,000 was transferred from his investment in Export to merchandise purchased. He surrendered no stock certificates. Petitioner received the inventory before the end of the first 7 months of 1948 and he used it in filling the order from the French colonies. On June 4, 1948 he entered into a supplemental agreement with the other stockholder of Merchandising permitting petitioner to handle and dispose of the inventory. Neither petitioner nor anyone in his behalf advised the Commissioner of Internal Revenue of the withdrawal of the inventory from Export, nor did anyone file a certificate of reduction of capital with the secretary of state of New York. On July 31, 1948 Export's earned surplus totaled $17,003.05. It *73 had not declared any cash dividends. Petitioner's attorney considered the possibility of dividend equivalence to be remote as the withdrawal was of unproductive inventory not usable by Export. He considered the withdrawal a reduction of capital. Petitioner knew nothing of dividend consequences but felt the transaction was required for business reasons. He knew that the agreed reduction of capital would follow since Export's capital requirements diminished. Petitioner expressed dissatisfaction with the operations of Merchandising. On August 16, 1948 he notified the other stockholder that he would dissolve Merchandising as of October 16, 1948, which he did. Petitioner transferred his individual business to Export on January 1, 1949. On his 1948 return petitioner claimed a net loss of $23,171.94 due to a business loss of $42,890.28. His 1946 return showed net income of $40,323.76 and tax due of $17,981.97. Neither he nor anyone in his behalf filed a claim for credit for the 1948 net operating loss against the 1946 income. Revenue agent Eber examined petitioner's 1946 individual income tax return. He examined petitioner's ledgers, journals, cash book, purchase books, other books *74 of original entry and canceled checks. Petitioner's accountant informed Eber of the 1948 loss, that he had filed no claim, and that he had expected an examination by an agent who would make allowance for the loss carryback. Eber extended his examination to the 1947 and 1948 returns. He compared the corresponding entries in the corporate books. Both Eber and petitioner's accountant knew that Export was due to be audited. Eber did not audit the corporate returns. Eber proposed various adjustments, some of which were accepted by petitioner's accountant as a basis for settlement. The agreed adjustments to 1948 income included a reduction in the business loss from $42,890.28 to $40,213.72 and an increase in rental income from $2,068.34 to $3,049.38. This total increase in 1948 income of $3,657.60 reduced petitioner's net operating loss from $23,171.94 to $19,514.34. Additional deductions for interest and taxes were not utilized in determining the loss carry-back. For 1946, adjustments agreed to included disallowance of miscellaneous deductions of $7,617.07, increase of income from a partnership of $240 and deduction of a damage suit settlement of $1,800, or a net income increase of *75 $6,057.07. Against this increase Eber applied the $19,514.34 net operating loss carry-back from 1948, resulting in a net decrease in 1946 income of $13,457.27 and an overassessment of $8,134.05. The overassessment was to be applied against an additional tax due for 1947. On February 26, 1952 petitioner executed and filed a Form 870, "Waiver of Restrictions on Assessment and Collections of Deficiency in Tax and Acceptance of Overassessment." The waiver provided for a 1947 tax deficiency of $11,387.30 and an overassessment for 1946 of $8,134.05. Those amounts corresponded to the findings in Eber's report dated March 24, 1952. On May 12, 1953 and on April 7, 1954 petitioner executed Forms 872, consents to extending the period of limitation for assessment of additional taxes for 1948 to December 31, 1954. No waiver or consent extending the period of limitation for 1946 was ever executed. In May 1952 respondent assessed the 1947 deficiency as found on the Form 870, plus interest. He allowed petitioner credit for $7,654.59 as a 1946 overpayment. The remaining $479.46 was credited against interest due for 1946. Petitioner received notice and demand dated June 6, 1952. A "Certificate of *76 Assessments and Payments," Form 899, certified on November 23, 1953, showed that $500 of the balance for 1947 had been paid on the following dates in 1953: March 3, April 20, May 27, July 7, and August 25. Agent Allers conducted an examination of Export's return for 1948. He suggested to petitioner's accountant the taxability of the inventory distribution as a dividend. Petitioner never personally agreed to such treatment. His accountant debited surplus and credited capital for $3,371.16 on Export's books, and explained the entry as intended to correct the treatment of the inventory withdrawal to that of a dividend to the extent of $17,003.05, earned surplus on July 31, 1948, and a reduction of capital for the remainder. Petitioner, unaware of the entry, refused to concur in his accountant's suggestion. On August 16, 1954 respondent mailed the notice of deficiency. He determined that the 1948 distribution of inventory was a dividend to the extent of $17,003.05, Export's earned surplus at July 31, 1948. He allowed previously unclaimed deductions of $519.34 for property and state income taxes and allowed the $1,218.21 of deductible interest and taxes not previously utilized in determining *77 the net operating loss carryback. Allowance of those two items and addition of the $17,003.05 treated as a taxable dividend reduced the loss carryback to $4,248.84. The adjustments to the 1946 items previously considered in determining the 1946 overassessment and the 1947 deficiency in the Form 870 were carried over unchanged into the deficiency computation. Opinion Stripped of complications the facts are that petitioner's wholly owned corporation went out of the business of buying and processing secondhand clothing in which it had previously been engaged. This happened in 1947 in conjunction with the organization of a new corporation of which petitioner was only half owner and which was designed to perform the merchandiseprocuring function. Petitioner's wholly owned corporation was thereafter to obtain the orders which were to be filled by the new company. Naturally enough the old business had on hand an unliquidated inventory. It is the disposition of that merchandise which gives rise to this controversy. The basic facts are not seriously in dispute. It is their interpretation and the inferences to be drawn from them that create the issue. When the original plan to have the *78 new company liquidate the merchandise inventory of the old business apparently fell short of any significant success, petitioner took over the merchandise himself and subsequently sold it as part of a series of independent steps in which neither corporation had any part. Respondent claims that this was essentially equivalent to a taxable dividend to petitioner to the extent of the accumulated earnings of the old corporation under section 115(g), Internal Revenue Code of 1939. Petitioner says it was a dividend in partial liquidation taxable only as provided in section 115(c). The solution seems to us to depend upon the reality and good faith of the steps actually taken. Without more, it would seem that a business, which for adequate reasons eliminates part of its operations and in the process rids itself of property no longer useful in those operations, has engaged in a partial liquidation in the most direct sense. When this occurs, the fact that the property is disposed of by distribution in kind to shareholders is not sufficient to convert it from a partial liquidation under section 115(c) to the equivalent of an ordinary dividend. John L. Sullivan, 17 T.C. 1420, affd. *79 (C.A. 5) 210 Fed. (2d) 607. "The partial distribution of corporate assets in order that they may, in the opinion of the stockholders, be more efficiently or better used or operated in some other way, such as by individuals, appears clearly no reason for application of subsection (g); rather, the negation thereof. * * *" [L. M. Lockhart, 8 T.C. 436, 441.] Here the old corporation was in the business of buying and selling merchandise. It abandoned the purchasing part of the business and retained only the selling end. So that nothing would seem more natural than that when this happened the assets constituting a miscellaneous inventory of merchandise previously bought would logically be the most unnecessary portion of the corporation's capital, and that which it would seem most natural to dispose of in liquidation. Respondent insists, however, that since petitioner subsequently sold the merchandise as a sole proprietor; and since he also abandoned the effort to operate through the new corporation, and returned in a subsequent year to the former full operation of the old corporation, the liquidation could not have been undertaken in good faith. We cannot *80 agree. "the Government may not * * * impose a tax merely because there has been a stock redemption, where the circumstances are free from artifice and beyond the terms and fair intendment of the provision. * * *" [Pearl B. Brown, Executrix, 26 B.T.A. 901, 907, affd. (C.A. 7) 69 Fed. (2d) 602, certiorari denied 293 U.S. 570.]
The most reasonable interpretation of the facts seems to us to be that there was a real intention on the part of both petitioner and his fellow stockholder to make the new arrangement work. It does not seem likely that either could have foreseen at that time that their efforts to organize and operate the new business would prove unworkable and that there would apparently have developed some sort of disagreement between them which made its dissolution necessary. Too much time and expense was obviously devoted to the new enterprise to make this interpretation reasonable. And it must have been at that time and not later that the intention to liquidate the old inventory was formed. The decision to turn it over to petitioner was evidently taken as a subsequent step when the effort to dispose of it through the new company *81 apparently ended in failure. Had it all been sold in that manner (at a loss, in fact, as it later was by petitioner himself) the present question would never have arisen. If the old company then had assets remaining, their distribution to petitioner would necessarily have taken a different form. In many ways, moreover, this resembles the problem presented in G. E. Nicholson, 17 T.C. 1399, dismissed per curiam (C.A. 10) 204 Fed. (2d) 690, and Hyman v. Helvering, ( C.A., D.C.) 71 Fed. (2d) 342, certiorari denied 293 U.S. 570. Upon its organization in 1945 this petitioner contributed to the old corporation $45,000 in merchandise inventory. Upon the corporation's withdrawal from that part of the business petitioner took back $45,000 in merchandise inventory. To borrow the language employed by the Court of Appeals in Hyman v. Helvering, supra at 344: "if the fund for distribution was a part of the capital contributed by the shareholders to be used in the actual business of the corporation, its distribution in whole or in part would, of course, be liquidation * * *" We emphasize that the distribution in question was not *82 in cash but consisted of property formerly used in the business but for which the old corporation apparently had no further use; and that if the old corporation had earnings and profits they remained available for the declaration of a dividend. We see nothing to justify treating the transactions as anything more than they appear on their face to be. So regarded the net result was very different from the declaration of a taxable dividend. Estate of Henry A. Golwynne, 26 T.C. - (September 28, 1956); Keefe v. Cote, ( C.A. 1) 213 Fed. (2d) 651. Cf. Flanagan v. Helvering, ( C.A., D.C.) 116 Fed. (2d) 937, affirming B.T.A. Memorandum Opinion; Estate of Charles D. Chandler, 22 T.C. 1158, affd. (C.A. 6) 228 Fed. (2d) 909. It had the effect of a true partial liquidation and should have been treated accordingly for tax purposes. Petitioner's alternative contentions need not be considered for obvious reasons. Decision will be entered under Rule 50.