THOMAS O. CAMPBELL and MARY F. CAMPBELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Campbell v. Commissioner
Docket No. 4594-69.
United States Tax Court
T.C. Memo 1973-101; 1973 Tax Ct. Memo LEXIS 189; 32 T.C.M. (CCH) 451; T.C.M. (RIA) 73101; April 25, 1973, Filed William R. Bagby, for the petitioners. Dennis M. Feeley, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for their taxable years 1962, 1963, and 1964 in the amounts of $4,615.99, $2,546.02, and $6,806.54, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: 1. Whether a $2,300 loss incurred by petitioners in 1963 as a result of the freezing of four boxwood and four 2 magnolia trees located around petitioners' home on their farm is deductible in full or should be limited under section 1231, I.R.C. 1954, [1] to reducing petitioners' gain from the sale of property used in their business; and whether a $450 loss from the destruction of a *191 diseased horse in 1964, which horse had been used in petitioners' business, is deductible in full or limited under section 1231 to reducing petitioners' gain from the sale of property used in their business. 2. Whether petitioners are entitled to deduct as a casualty loss their basis in a horse kept for personal use which was destroyed in 1962 because of its affliction with laminitis. 3. By what amounts should petitioners' income for each of the years 1962, 1963, and 1964 be increased to adjust for the costs included in petitioners' claimed business expense deductions allocable to keeping two horses for personal use. 4. Whether petitioners incurred an ordinary or capital loss of their adjusted basis plus demolition costs of a barn which had been used in their business, which barn was demolished after petitioners had sold the land on which the barn was standing. 3 5. Whether costs of $93.00 for removing trees, $32.13 for gate posts, $309.19 for replacing electrical service box and wiring in a barn, $250.40 for work on culvert, $2,357.23 for concrete strips in barns, and $1,116.69 for black topping *192 hallways in barns were properly deducted as repairs or are capital improvements. 6. Whether respondent properly increased the useful lives previously used by petitioners in computing depreciation on certain farm buildings and fixtures used in their business, thereby decreasing petitioners' claimed deductions for depreciation for each of the years 1962, 1963, and 1964. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Thomas O. Campbell and Mary F. Campbell, husband and wife who resided at Lexington, Kentucky at the time they filed the petition in this case, filed their joint Federal income tax returns for their taxable years 1962, 1963, and 1964 with the district director of internal revenue, Louisville, Kentucky. During the years here in issue petitioners were in the business of raising tobacco and thoroughbred horses on farms which they owned and operated under the names, "Home Farm," "Haddix Farm" and "Hibernia Farm." 4 Four boxwood and four magnolia trees located on the front and side of petitioners' personal residence on the Home Farm were killed in a hard freeze in 1963. None of the trees was insured. The trees *193 were personal assets of petitioners and had no relationship to petitioners' farming operations. Petitioners suffered a loss in the amount of $2,300 as a result of the boxwood and magnolia trees being killed. During the taxable year 1964 petitioners, in connection with their farming business, purchased an interest in a thouroughbred race horse named, "West River" at a cost of $450. The horse had to be destroyed by a veterinarian in 1964 because of a painful bowed tendon. In 1963 and 1964 petitioners realized gains of $26,190.95 and $74,565.58, respectively, from the sale of brood mares used in their business. "Driftwood," a horse owned by Mary F. Campbell as a personal riding and show horse, was destroyed by a veterinarian on November 15, 1962, in order to relieve the horse's inhumane suffering resulting from its being afflicted with laminitis. "Driftwood" was purchased by Mary F. Campbell on June 14, 1961, for the amount of $6,000. Laminitis is an inflamation of the laminae, the membranes which lie between the sensitive and insensitive structure of the hoof of a horse. Laminitis may result from a horse's overeating or overdrinking, or it may result from a change in *194 5 the biochemical processes of the horse, or by excessively heavy use of the horse. In some cases drugs will completely reverse the process of inflammation and the horse will be cured. In other cases, drugs will partially reverse the process and although the horse's hoof will be abnormal, the horse will be mobile and will suffer no pain. In other cases the laminae will separate and the coffin bone will come through the horse's hoof. In such cases the horse is unable to stand with the result that his physiological processes become malfunctional. In such cases the horse cannot be cured and the veterinarian will recommend his destruction to relieve his severe suffering. The veterinarian who treated Driftwood first saw him in connection with the laminitis he suffered in 1962 between 30 and 45 days before the horse was destroyed. At first the veterinarian thought the laminitis in Driftwood could be arrested but about 30 to 45 days after he started treating Driftwood, the horse's coffin bone came through his hoof and the veterinarian recommended his destruction since he believed the condition could not be cured. The veterinarian considered the laminitis which afflicted Driftwood *195 to be a disease. In addition to Driftwood, petitioners owned another personal horse, Out Late, during the years 1962, 1963, and 1964. During the 8 months of spring, summer, and fall, these two horses (only one after the destruction of Driftwood) grazed and pastured on petitioners' farm. During the 4 winter months, 6 the horses were fed a feed which at that time cost about 30 cents a day for the quantity each horse consumed. The horse, Out Late, was boarded at the Patrick Murphy Stables, a horse training school, for 21 days in 1962 and 31 days in 1963. The cost of boarding Out Late at the Patrick Murphy Stables amounted to $60 per month and was paid for by petitioners and not charged to the cost of operating their farms. Petitioners boarded horses for other farms and charged $125 per month as of 1970. Driftwood and Out Late received the same care of watering, stabling, and veterinarian services on petitioners' farms as did the horses which were business assets of petitioners. In 1955 petitioners purchased a 180 acre farm known as the Haddix Farm. The Haddix Farm consists of an 80-acre tract bordering the Home Farm, and a 100-acre tract to the west of the 80-acre tract. *196 As of January 1, 1962, petitioners owned all of the 80-acre tract but had sold 85 acres of the 100-acre tract, leaving only 15 acres of this tract which they owned.Located on this 15-acre tract was a barn from which petitioners had operated their thoroughbred race horse business and in which they had stored tobacco in the years prior to 1962.This barn, referred to hereafter as the Haddix barn, was in good usable condition during the first few months of 1962.
For about 7 years prior to 1962 petitioners had leased their Home Farm to another race horse farming business. On 7 December 31, 1961, petitioners regained possession of the Home Farm and immediately thereafter began to transfer their farming operations from the Haddix Farm to the Home Farm. The moving operation was completed by the end of January 1962. Petitioners in planning to move the main operations back to the Home Farm had realized that the Haddix barn would be located across a stream and too far to the west of the center of their operations to be practically usable and had contemplated moving the barn to a more convenient location near the Home Farm. However, on further investigation, they concluded that the cost *197 of moving the barn would be so great as to make moving it impractical. On June 28, 1962, petitioners conveyed the 15 acres on which was located the Haddix barn to Robert D. Raley, an employee in a business of Thomas O. Campbell, which was unrelated to his farming business. The deed of conveyance stated that the Campbells "grant and convey unto (Raley) his heirs and assigns, all that tract or parcel of land situated near the Hume Road * * *." The deed did not reserve unto the grantors any rights other than an easement from Hume Road across the 15-acre tract to the westerly border of the Home Farm. However, prior to agreeing to sell the 15 acres to Raley, petitioners had an understanding with Raley that they reserved the barn to themselves.Although petitioners had determined 8 prior to January 1962 that it was not feasible to move the barn or to further use it in their business, their understanding with Raley that the sale of the 15 acres did not include the sale of the barn was not altered. Shortly after June 28, 1962, farm laborers employed by petitioners demolished the Haddix barn at the direction of petitioners. Petitioners removed salvage from the demolished barn which *198 they valued at $200. As of January 1, 1962, the adjusted basis of the Haddix barn was $3,966. No depreciation deduction was taken on the barn by petitioners for the year 1962. In petitioners' taxable year 1964, they purchased lumber from Tiny Clark for the amount of $763.54 which included $32.13 for four fence posts and paid him $103 to move dead and blown-down trees from their farm. Petitioners expended the amount of $309.19 in the taxable year 1964 for labor and electrical materials in replacing and improving the electrical circuits in a barn on their farm. The electrical work consisted of installing a larger service box and a new metal mast for the wires. New additional lights and outlets were also installed. Between the time the existing wiring in the barn was installed and the time the new wiring was installed, a more stringent electrical building code was being enforced in petitioners' county. 9 Petitioners spent $250.40 in the taxable year 1964 to lower the level of a concrete culvert on their Home Farm. The culvert had been installed too high in the ground and a visitor to the farm had narrowly escaped injury when his car passed over the culvert. Located on *199 the Home Farm were two barns which were seriously damaged by termites. The damage was discovered in 1964. In addition to replacing and repairing the termite damaged wood structures, petitioners had the hallway in each barn paved with asphalt. The cost of the paving totaled $1,066.69 and the asphalt covered what had been a hard-packed clay hallway. Alongside each hallway in the barns were the horse stalls. The wood panel partitions which form the whole front side of each stall had rested on timbers or wooden footings lying on the dirt floor of the barn. These footings which were discovered to be infested with termites were replaced with concrete strips poured in the ground on each side of the hallway of the two barns. The concrete footings support the wood panel partitions and the main weight-bearing posts of the barn which had previously been lodged in the soil. The cost of installing the concrete footings was $2,307.23 and it was incurred in petitioners' taxable year 1964. When petitioners acquired the Home Farm in 1943 and 1944 they had placed a useful life of 25 years on the two tenant houses, the seven barns, and the stripping room located on 10 these parcels of *200 land. Petitioners had claimed depreciation on these buildings at the rate of 4 percent a year since 1943 and 1944. The buildings were the ones being used in petitioners' farming operations in 1962, 1963, and 1964 after they took possession of the Home Farm from the tenant to which it had been leased prior to January 1, 1962. Petitioners in their farming operations followed a policy of keeping the buildings used in their farming operations in good repair. When the Hibernia Farm was acquired by petitioners in 1957, they established for accounting purposes the useful lives of certain improvements on that farm as follows: Wooden fence
6-2/3 years
Wire fence
6-2/3 years
Frame residence
10 years
Tobacco barn
10 years
Barn
10 years
Concrete silo
10 years
Frame tenant house
10 years
Petitioners had taken depreciation on these improvements on their income tax returns since 1957 on the basis of the above indicated useful lives. Petitioners on September 1, 1964, acquired new fencing with a cost basis of $1,278.43 and are entitled to an investment credit in 1964 with respect to this acquisition. In his statutory notice of deficiency, respondent made the *201 following adjustments to petitioners' income as reported on their returns: (1) Petitioners on their income tax returns claimed the amount of $2,300 resulting from the freezing of the boxwood and magnolia trees on their lawn in the taxable year 1963 as a casualty loss deductible in full. Respondent determined that under section 1231 this loss was required to be used only 11 to reduce petitioners' gain from the sale of assets used in their business. (2) Petitioners on their 1964 income tax return claimed the $450 resulting from the destruction of the race horse West River as a casualty loss deductible in full. Respondent determined that the amount should be offset under section 1231 against petitioners' gains from the sale of property used in their business. (3) Petitioners on their 1962 income tax return deducted $6,000 as a casualty loss resulting from the destruction of their horse Driftwood. Respondent in his notice of deficiency disallowed this claimed deduction. (4) Respondent in his notice of deficiency determined that petitioners' deductions claimed on their returns for maintaining thoroughbred race horses were overstated in the taxable years 1962, 1963, and *202 1964 by including in these claimed deductible expenses the costs incurred in maintaining the two personal horses Driftwood and Out Late and that the amounts of the overstated costs were $1,050, $900, and $900 for the years 1962, 1963, and 1964, respectively. (5) Petitioners on their 1962 income tax return deducted $3,766 as a demolition loss on the Haddix barn. Respondent in his notice of deficiency determined that the amount of $3,766 should be used to reduce the gain realized by petitioners from the sale of the property upon which the barn was located and 12 disallowed the claimed loss except to that extent. Respondent also determined that the labor cost of demolishing the Haddix barn was $500 which also should be offset against the gain realized from the sale of the property upon which the barn was located. He therefore increased petitioners' income from farming operations in 1962 by $500 and decreased their capital gains by $500. (6) Petitioners claimed the expenditures for the following items as deductible repair expenses on their 1964 income tax return: New barn - additional items
$856.54
New barn - electrical work
309.19
Barns renovated - asphalt and concrete work
3,624.32
*203 Respondent disallowed these claimed deductions and treated these items as capital expenditures subject to depreciation and increased petitioners' depreciation deductions otherwise computed accordingly. (7) Respondent increased the useful life used by petitioners in computing depreciation on each of the following structures on petitioners' Hibernia farm so as to have its remaining useful life be 10 years as of December 31, 1961: Wooden fence Wire fence Frame residence Tobacco barn Barn Concrete silo Frame tenant house 13 (8) Respondent increased the useful life of each of the structures on petitioners' Home farm as used by petitioners on their income tax return in computing depreciation so as to have its useful life as of December 31, 1961, be 15 years. OPINION Petitioners contend they are entitled to deduct the full amount of the loss in 1963 from the freezing of their boxwood and magnolias from their ordinary income as a casualty loss as defined by section 165(c) (3). Respondent takes the position that since petitioners had gains in 1963 from the sale of property used in their business in excess of the loss from the freezing of the magnolia and boxwood *204 trees, section 1231 requires that the loss be treated as a long-term capital loss. The amount of the loss is not in dispute and petitioners concede that the destroyed trees were personal capital assets held by them for more than 6 months. Accordingly, the sole issue is whether section 1231 as applied to the years here in issue requires that the loss be offset against long-term capital gain from the sale of assets used in petitioners' business. Petitioners contend that section 1231(a) requires only that losses from involuntary conversions (which are treated by section 1231 as including losses by destruction) be offset against gains from involuntary conversions, but does not require losses from involuntary conversion or the amount of a 14 casualty loss of a personal asset to be offset against gains from the sale of property used in the trade or business, as distinguished from involuntary conversions. Petitioners contend, therefore, that their casualty loss from the freezing of their shrubs and trees may be deducted in full from ordinary income rather than offset against section 1231 gains. [2]
*205 Petitioners rely on John L. Sullivan, 17 T.C. 1420 (1952) affirmed on another issue 210 F. 2d 607 (C. A. 5, 1954), for the proposition that casualty losses and other involuntary conversion losses need be offset only against gains from involuntary conversions and if a taxpayer has no gains from such involuntary 15 conversions such losses may be deducted in full from ordinary income. In our view petitioners have misinterpreted the John L. Sullivan case. In John L. Sullivan, supra, the taxpayer sold certain capital assets and reported the gain as long-term capital gain. The taxpayer also reported losses from the sale of horses and a loss from the death of a horse. The taxpayer did not offset the losses on the sale of the horses and the death of the horse against his long-term capital gain but rather deducted the losses from ordinary income. We upheld 16 the taxpayer's treatment of his losses, and in so doing, made the following statement (at 1426) upon which petitioners rely: A proper interpretation is that not all gains on capital assets *206 held for more than 6 months are to be considered for the purpose of section 117(j) (2)[3] but only the recognized gains from the compulsory or involuntary conversion of capital assets held for more than 6 months into other property or money. The petitioners had no such gains in 1943. The section does not apply. * * * The John L. Sullivan case is inapplicable to the instant case. The taxpayer in that case not only realized no gain from the involuntary conversion of capital assets but also had no gain from the sale of property used in his trade or business. There was therefore no gain against which the losses on the sale of horses and the death of a horse were required to be offset by the provisions of section 1231 (then section 117(j) (2), I.R.C. 1939), and this is the substance of the statement above quoted. While petitioners' contention that gains and losses from involuntary conversions must be segregated from other section 1231 transactions may be valid with respect to taxable years beginning after December 31, 1969, it does not follow as petitioners contend that *207 section 1231(a) as amended by Pub. L. 9-172 (Dec. 30, 1969), incorporates "the ruling under the Sullivan case." In E. Taylor Chewning, 44 T.C. 678 (1955), affirmed 363 F. 2d 441 (C.A. 4, 1966), certiorari denied 385 U.S. 930 (1966), the taxpayer's boxwood bushes were destroyed by a severe snowstorm. During that same taxable year the taxpayer recognized and reported 17 gains from the sale of breeding cattle in excess of the loss from the destruction of the boxwood bushes. The taxpayer contended that he was entitled to deduct his loss from the destruction of the boxwood bushes from his ordinary income. Respondent contended that section 1231 required that the casualty loss of the taxpayer's shrubs be offset against the long-term capital gain realized from the sale of his breeding cattle. We stated at 683: except in the case of property used in the trade or business or capital assets held for the production of income, casualty losses are subject to the provisions of section 1231, as amended, whether or not compensated for by insurance in any *208 amount. We hold therefore, that the respondent properly determined that the loss sustained by the petitioners with respect to the boxwood bushes is not deductible as an ordinary loss under section 165(c) (3), but must be applied against the petitioners' gain from sale of breeding cattle, pursuant to the provisions of section 1231. In Morrison v. United States, 355 F. 2d 219 (C.A. 6, 1966), certiorari denied 384 U.S. 986 (1966), the taxpayer sustained a loss to her personal residence resulting from damage caused by an ice storm to trees, shrubbery and other improvements. In the same taxable year, the taxpayer realized a gain from the sale of an orange grove which was property used in her trade or business and therefore governed by section 1231. The Court of Appeals held that the taxpayer was not entitled to deduct her loss from damage to her personal assets under section 165(c) (3) but was required by section 1231 to offset the loss against the gain from the sale of the orange grove under section 1231(a). See also Weyerhaeuser Company v. United States, 402 F. 2d 620 (C.A. 9, 1968), and Pennsylvania18 Power & Light Company v. United States, 411 F. 2d 1300 *209 (Ct. Cls., 1969). We hold that the loss which petitioners incurred in their taxable year 1963 from the freezing of their magnolia and boxwood trees must be offset against the gains from the sale of the brood mares in that year and therefore sustain respondent's determination in this respect. Petitioners contend that they are entitled to deduct the full amount of the loss they incurred upon the destruction of their race horse West River in 1964. Respondent contends that this loss must be offset under section 1231 against petitioners' gains in 1964 from the sale of property used in their business. The race horse West River was a business asset of petitioners. Petitioners contend and respondent agrees that this horse was livestock within the meaning of section 1231(b) (3)[4] and was therefore property used in the trade or business of petitioners. Resondent's concession leaves for our decision the sole issue of whether the destruction of West River was a casualty. If it was a casualty, the $450 loss is deductible in full under section 1231(a) which provided for the year in issue that: *210 In case of any property used in the trade or business and of any capital asset held for more than 6 months and held for the production of income, this subsection shall not apply to any loss, in respect of which the taxpayer is not compensated for by insurance in any amount, arising from fire, storm, shipwreck, or other casualty, or from theft. See Weyerhauser Company v. United States, supra, and Pennsylvania Power & Light Company v. United States, supra.19 Whether or not the destruction of the horse West River is a casualty within the meaning of section 1231(a) is a question of fact. Loss of property occasioned by disease has been held by the Court of Appeals for the Circuit to which an appeal in this case would lie not to be a casualty loss. Burns v. United States, 284 F. 2d 436 (C.A. 6, 1960), affirming per curiam *211 174 F. Supp. 203 (N.D. Ohio, 1959). The meager record before us reveals that petitioners never saw the horse West River and have no knowledge of how the horse developed the bowed tendon which required that it be destroyed. Because of the absence of proof to show that the destruction of West River constituted a casualty loss, we sustain respondent's determination as to the treatment of this loss. Petitioners contend that they sustained a casualty loss from the destruction of a personal horse, Driftwood. This horse was a hunter and show horse and was not used by petitioners in their trade or business or held by them for the production of income. Respondent contends that the destruction of Drfitwood was not a casualty since it resulted from his affliction with laminitis. Petitioners' expert witeness, the veterinarian that treated Driftwood, testified that laminitis, also known as founder, is an inflammation of the laminae which are the membranes which are located between the insensitive-horny outer tissue and the sensitive inner tissue of a horse's hoof. Sometime laminitis can be cured, sometimes it can be arrested, and sometimes, as in the case of Driftwood, it *212 progresses to the point where it cannot be cured or arrested and the veterinarian recommends that the horse be destroyed to relieve its suffering. Petitioners argue 20 that laminitis is not a disease. However, their expert witness, a veterinarian, classified it as a disease. Petitioners' argument in this case is very comparable to the argument of the taxpayers rejected by the Court in Burns v. United States, supra.In that case the taxpayer claimed a casualty loss because of the removal of an elm tree shortly after it was discovered that it was infected with Dutch Elm disease, which disease ultimately would have caused the death of the tree had it not been removed. Under the holding in Burns v. United States, supra, the deduction claimed by petitioners is not allowable. Furthermore, petitioners in this case have failed to establish how long Driftwood had been developing laminitis or that it had not developed over a long period of time because of hard use causing wear on his hoof. We therefore sustain respondent's disallowance of petitioners' claimed casualty loss from the destruction of Driftwood. Respondent determined that petitioners included *213 the costs of maintaining two personal horses in the costs deducted on their income tax returns for operating their thoroughbred race horse business and that the costs so deducted were in the amounts of $1,050, $900, and $900 for the taxable years 1962, 1963, and 1964, respectively. Petitioners contend that the amounts erroneously deducted for upkeep of these personal horses were only $57, $27, and $36.60 for the years 1962, 1963, and 1964 respectively. These amounts are computed on a basis of a daily cost of 30 cents to maintain a horse during the winter months and no cost during the summer months. Respondent's determination is based on a monthly cost of maintaining a horse on petitioners' farm during the years in issue of $75. Petitioner Thomas O. Campbell testified that the charge for boarding out horses was 21 from $60 to $125 per month and that the operation was not always profitable based on these charges. Petitioners have failed to state which costs if any, of boarding horses should not be allocated to the keeping of personal horses. We have examined the itemized schedules of income and expense of petitioners' farm and horse operations and conclude from a consideration *214 of these expenditures and the other evidence of record that respondent's determination reflects a reasonable allocation of costs to the keeping of petitioners' personal horses. Petitioners have not proved which of the expenses of operations, if any, should not apply to maintaining the two pleasure horses. In the absence of this proof, respondent's determination is sustained. In 1962 petitioners sold 15 acres of the Haddix farm to Robert D. Raley. Situated on the 15-acre plot was a barn, referred to as the Haddix barn. Shortly after the conveyance, the Haddix barn was razed by petitioners' employees. Petitioners claimed a demolition loss of $3,766 for the barn on their 1962 return and in their petition. At the trial petitioners enlarged this contention to alternatively claim that the loss constitutes a "retirement loss" or an "obsolescence loss." While petitioners did not formally amend their petition to include their alternative contention that the loss of the barn was a retirement loss or an obsolescence loss, respondent made no objection at the trial to these contentions even though he was aware that these alternative contentions were not set forth in the petition. [5] Under *215 these circumstances 22 we consider these alternative contentions to be properly before us. Section 1.167(a)-8(a), Income Tax Regs., states in part as follows: (3) Where an asset is permanently retired from use in the trade or business or in the production of income but is not disposed of by the taxpayer or physically abandoned (as, for example, when the asset is transferred to a supplies or scrap account), gain will not be recognized. In such a case loss will be recognized measured by the excess of the adjusted basis of the asset at the time of retirement over the estimated salvage value or over the fair market value at the time of such retirement if greater, but only if - (i) The retirement is an abnormal retirement, or * * * (4) Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition *216 of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition.
In our view the evidence here shows that there was a retirement of the Haddix barn by petitioners by actual physical abandonment of that barn in 1962. When petitioners in January 1962 removed their thoroughbred horses and tobacco from the Haddix barn, it was with an intent to discard the barn and never again to use it. Prior to January 1962 petitioners had contemplated moving the Haddix barn to a location more convenient to their Home farm but concluded that moving the barn would be uneconomical because of the cost involved. The sale of the land upon which the barn was situated was not the cause of nor related to petitioners' intent to cease operations in the Haddix barn. Accordingly, we find that petitioners are entitled to a deduction of the amount claimed upon the retirement of the Haddix barn in 1962. 23 *217 In view of our conclusion on a factual basis that petitioners retired the Haddix barn in January 1962, we need not consider petitioners' other contentions with respect to the deductibility of the adjusted basis of that barn. Respondent also determined that the value of the labor used in demolishing the Haddix barn of $500 should be added to petitioners' income and deducted from the gross sales price of the property on which the barn was situated. Petitioners deducted as a cost of their horse and tobacco business in 1962 the amount of $16,380.96 as labor expense. The record shows that the barn was demolished with farm labor and there is nothing to show that the amount of $500 as determined by respondent is incorrect. While petitioners do not concede that respondent's adjustment with respect to the labor used to demolish the barn is proper they make no argument as to why it is not. Since we have concluded in accordance with petitioners' contention that petitioners retired the barn in January 1962 but retained the barn when the land was sold to Raley, it would follow that they were obligated to remove the barn from the land when it was sold and that respondent s adjustment of the *218 $500 labor item is proper and we so hold. Petitioners expended certain amounts of money in 1964 for items they contend constitute repairs to their farm buildings which respondent contends constitute improvements which, for tax purposes, must be capitalized. The distinction between repairs and replacement has long been recognized as we stated in Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, 106 (1962): 24 In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those *219 for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * * In our view the record discloses that certain of petitioners' expenditures which respondent capitalized did constitute deductible repair costs. The $103 paid to Tiny Clark to move dead and blown-down trees was a repair expense and is deductible. However, the evidence does not show that $32.13 of the lumber purchased from Tiny Clark for the amount of $763.54 was to be used for repairs. There is no showing of the use of the four fence posts. Accordingly, we hold that the amount of $763.54 is a capital expenditure. In our view the amount of $309.19 spent by petitioners for electrical work on one of their barns constitutes a capital expenditure. Petitioners have failed to show that any of the amounts spent for electrical work on the barn were for items which might constitute repairs as opposed to improvements. We therefore conclude that the entire expenditures for electrical work *220 on the barn must be capitalized because the entire project was for the general improvement of the barn. Petitioners' reliance upon the involuntariness of their spending due to the more stringent electrical 25 building code is misplaced. Even though expenditures may be made to meet a legal requirement, if they result in an improvement they must be capitalized. International Building Co., 21 B.T.A. 617, 621 (1930). The reinstallation of the concrete culvert in 1964 was, in our view, nothing more than a repair of property.Accordingly, we hold that the cost of reinstallation is deductible as claimed by petitioners. See Toledo Home Federal Savings & Loan Ass'n v. United States, 203 F. Supp. 491, 493-494 (N.D. Ohio, 1962), affirmed without discussion of this issue, 318 F. 2d 292 (C.A. 6, 1963). From the facts we conclude that the expenditure made by petitioners for laying asphalt on the hallways of their horse barns constitutes a nondeductible capital expenditure. The asphalt was layed over packed clay. Petitioners contend that the asphalt did *221 not increase the useful life of the barn nor was it as satisfactory as the clay. However, it appears from the record that the asphalt hallways did increase the value of the horse barns and constituted a substantial improvement to the barns. Accordingly, we hold that the cost of laying the asphalt must be capitalized and may not be deducted by petitioners in their taxable year 1964 as a repair expense.
Petitioners had concrete strips installed in two horse barns which replaced wooden footings upon which the front partitions of the horse stalls rested. These concrete strips also supported the main weight supporting posts of the barn which had, prior to the laying of the concrete, been merely imbedded in the ground. 26 The evidence indicates that the installation of the concrete strips was made merely to allow the continued use of the barn. The fact situation here is very similar to that in the early case of Illinois Merchants Trust Co., Executor supra. On the authority of this case we hold that the installation of the concrete strips was a repair. The final issue for our decision is whether petitioners overstated depreciation expenses on certain farm buildings *222 and fixtures by understating the useful lives of these buildings and fixtures… Respondent in his notice of deficiency redetermined the useful lives of these buildings and fixtures as of January 1, 1962. When there is a significant change in the useful life of an asset and there is a clear and convincing basis for the redetermination of its useful life, a change in the useful life of the asset adopted when the asset was acquired may be made. Cohn v. United States, 259 F. 2d 371 (C.A. 6, 1958). Of course, the determination of the useful life of an asset for depreciation purposes must be made on the basis of facts known to exist at the end of the year or period for which the determination is being made. Section 1.167(a)-1(b), Income Tax Regs.Petitioners have the burden of proving that the Commissioner did not properly redetermine the useful lives of the assets and that changes as of the date for which the redetermination was made were not significant. In our view, petitioners have not carried this burden. For petitioners to prevail they must *223 show that at the end of each taxable year in issue there were not facts known to exist which would warrant the changing of the useful life of the asset in question. Such proof was not presented by petitioners. 27 Accordingly, we sustain respondent's determination with respect to the useful lives of certain of petitioners' farm assets and find that the respondent properly determined petitioners' depreciation deductions for the taxable years 1962, 1963, and 1964. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954. ↩
2. During the taxable year 1963, section 1231(a), I.R.C. 1954, provided as follows: Sec. 1231. Property Used in the Trade or Business and Involuntary Conversions. (a) General Rule - If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection - (1) in determining under this subsection whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and (2) losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion. In the case of any property used in the trade or business and of any capital asset held for more than 6 months and held for the production of income, this subsection shall not apply to any loss, in respect of which the taxpayer is not compensated for by insurance in any amount, arising from fire, storm, shipwreck, or other casualty, or from theft. ↩
3. Sec. 117(j) (2), I.R.C. 1939, is the predecessor of sec. 1231, I.R.C. 1954↩. 4. During 1964, sec. 1231(b) (3), I.R.C., 1954, stated as follows: (3) Livestock - Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition.Such term does not include poultry. ↩
5. Respondent's counsel stated in his opening argument, "* * * petitioner's position as he just stated it, represents a departure from his pleadings." ↩